## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PLB INVESTMENTS LLC, JOHN KUEHNER AND A.S. PALMER INVESTMENTS LLC, individually and on behalf of all those similarly situated<br><br>Plaintiffs<br><br>v.<br><br>HEARTLAND BANK AND TRUST COMPANY AND PNC BANK N.A.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs PLB Investments LLC, John Kuehner and A.S. Palmer Investments LLC on behalf of themselves and all others similarly situated, allege as follows against Defendants Heartland Bank and Trust Company ("Heartland") and PNC Bank N.A. ("PNC") based on personal knowledge as to Plaintiffs and their own acts, and otherwise on information and belief, based on the investigations of their counsel which included review of public statements, case filings of the United States Securities and Exchange Commission ("SEC"), sworn declarations of Thomas Kentner, a loan officer at Heartland Bank, and other sworn declarations including the exhibits incorporated therein, statements and records submitted by the Court-appointed Receiver and others in the SEC's case against Todays Growth

Consultant Inc. ("TGC"),[1] other court filings, investor records, media reports, and social media information, as well as other commentary, analysis, and information:

## SUMMARY

1.    Defendants Heartland and PNC assisted, aided and abetted, enabled, and facilitated a fraudulent, Ponzi-like scheme that stole millions of dollars from hundreds of victims across the country and misused, diverted, and misappropriated the investors' proceeds, all through Defendants' bank accounts and with their knowing and negligent assistance.

2.    TGC, also known as The Income Store, (together, "TGC") was a long-running Ponzi-like scheme organized and perpetrated by Kenneth D. Courtright III ("Courtright"), TGC's founder, co-owner, and Chairman. TGC's only other co-owner is Courtright's wife. Plaintiffs and members of the proposed class entered into Consulting Performance Agreements ("CPAs") with TGC, which were sold through unregistered offerings advertised on websites and radio ads, purporting to provide investors with a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC discretionarily acquired or built for the investor and then developed, maintained, and hosted. From at least January 2017 through October 2019, TGC and Courtright have raised at least $75 million from more than 500 investors who executed CPAs.

3.    TGC and Courtright advertised themselves to be experts in monetizing websites, and touted their extensive expertise and skill in identifying profitable websites to be purchased for their investors, building new authoritative websites, and maintaining and growing such websites to generate profits for investors. They held discretionary authority on

---

[1] *Securities and Exchange Commission v. Todays Growth Consultant et al.*, Case No. 1:19-cv-08454 (N.D. Ill. Dec. 27, 2019) (the "SEC Action").

how to invest their investors' money, from selecting the website(s) to purchase or build, developing them as/if needed in their evaluation, and monetizing them.

4.      Pursuant to the CPAs, investors were required to pay a so-called "Upfront Fee" and to give TGC password access to the websites that TGC purchased or developed for them, and TGC was required to use the Upfront Fee to acquire or build revenue-generating websites for the investor and then to develop, market and maintain the websites. The CPAs were principally structured in a manner that required no effort from the investor beyond payment of the initial investment amount, and investors were to receive profits solely from TGC's expertise and efforts.

5.      In reality, TGC's business model was not successful and TGC was not in satisfactory financial condition. TGC was not able to perform its contractual duties under the CPAs and operated a Ponzi scheme to preserve a façade of legitimate business activities, all in plain sight of and with the crucial assistance to its bankers—first Heartland and then PNC—without whom the scheme could not have been accomplished and perpetrated for years. Plaintiffs assert claims of fraud, violations of the Illinois Fiduciary Obligations Act, breach of fiduciary duty, aiding and abetting fraud, aiding and abetting breach of fiduciary duty and negligence against Defendants.[2]

6.      In the CPAs executed by investors and TGC, TGC promised investors the greater of either 50% of their website revenues or a minimum annual guaranteed return (typically ranging from 13% to 20% of the initial investment amount) to be paid monthly. TGC backed its guarantee with various representations, including that it is in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its

---

[2] Plaintiffs plead their negligence claims in the alternative, as more fully detailed below.

contractual duties" and that it is "debt-free . . . with no accounts payable or loans outstanding."

7.     In fact, TGG generated no or only nominal returns from bona fide business activities. To maintain the Ponzi scheme, TGC and Courtright used new investor funds to pay the guaranteed returns to existing investors, under the guise of revenue from the websites.

8.     Collectively, investor websites have generated materially less revenue than the guaranteed amounts specified in the CPAs. For instance, from January 1, 2017 through at least October 31, 2019, investor websites generated approximately $9 million in advertising and product sales revenue. During the same period, TGC paid investors at least $30 million.

9.     TGC's contemporaneous financial statements and bank records show that, in classic Ponzi-like fashion, from at least January 2017 into at least May 2019, TGC funded the shortfall between website revenues and its guaranteed investor payouts primarily through the offer and sale of CPAs to new or repeat investors.

10.     Although TGC appears to have added loans as a second source of funds beginning in May 2019, including several large loans from distressed lending companies, TGC continued to raise funds through the offer and sale of CPAs and continued after May 2019 to operate in a Ponzi-like fashion. TGC co-mingled investor funds with loan proceeds in Defendant PNC's account, and instructed PNC to use the co-mingled funds to both make payments to investors and begin to repay its loans.

11.     Throughout, with Defendants' key assistance, TGC also diverted millions in investor funds to pay Courtright' s personal expenses, including his personal home mortgage

4

—which was held by Defendant Heartland—and private secondary school tuition, among numerous other personal expenses. Misuse of investor funds to satisfy TGC's payment obligations to other investors and for Courtright's personal expenses is an express violation of the use of funds provision in the CPAs that Heartland reviewed. Such cash flows from investor accounts to personal accounts are indicative of a Ponzi-like scheme.

12.     TGC's scheme was unsustainable. On December 13, 2019, TGC informed investors that it put a temporary moratorium on investor payouts due to cash flow problems. It offered investors a variety of options, including to buy back their investments in exchange for an interest-bearing promissory note. TGC told investors that if they remain investors, it will resume investor payouts in April 2020.

13.     On December 27, 2019, the SEC filed suit against TGC and Courtright, *SEC v. Today's Growth Consultant Inc.*, Case 1:19-cv-08454 (N.D. Ill.) (ECF No. 2), seeking, among other relief, termination of the Ponzi scheme and freezing Defendants' assets. On December 30, 2019, the court entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief (ECF No. 20) and an Order Appointing Receiver (ECF No. 19).

14.     The Receiver's Initial Report filed on January 30, 2020 (ECF No. 45) stated that "[e]ven with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of ($5.7 m) and in 2019 of ($7.5m). Indeed, the payroll expense alone exceeded the website/e-commerce revenue." The Receiver also stated: "[t]he Receiver's review of the books and records of the company confirm the SEC's allegations that new investor funds and loans were used to pay the investors/website partners, not website revenue. For example, in 2018, website revenue was under $2m and website payout to investors was approximately $12.7m and

likewise in 2019 website revenue was under $4m and website investor payout was $16.5m. *In short, this was a Ponzi scheme.*" (Emphasis added)

15.     The Receiver stated that "TGC's solicitation of investments from investors makes up the largest segment of its 'revenue.' Pursuant to the Profit and Losses accounting from the company's records, in 2019 alone TGC generated 'revenue' from investors of approximately $41.5 million and website income of $3,724,809.00. … During that same period, TGC paid out $16.5 million to investors and operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873 for 2019. Prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments. *Therefore, TGC's business depended on the use of new investors' up-front payments (and perhaps loan proceeds) to cover its obligations to earlier investors much in the vain of a Ponzi scheme. As such, the Receiver believes that TGC's business was not sustainable.*" (Emphasis added)

16.     The Receiver also noted that "[i]n addition to using investor funds, more than $12m in loans were obtained to assist in paying investors."

17.     On February 4, 2020, a criminal complaint was filed against Courtright, accusing him of committing wire fraud. *United States of America v. Kenneth E. Courtright,* Case Number 20CR 77 (N.D. Ill.).

18.     Courtright knew for years that he was operating TGC as a Ponzi scheme and was misusing and diverting his investors' money, in breach of his fiduciary duties to them. In fact, in September 2018, while applying to increase TGC's line of credit with its then-current bank, Heartland, Courtright commented to a Heartland representative that TGC had used and would continue to use incoming funds from new investors to cover the shortfall

between website revenues and investor payouts until advertising revenues increased or TGC developed an alternative revenue stream. Heartland indicated that it closed TGC's accounts, out of a stated concern that TGC funded payouts to existing investors with new investors' money, and TGC moved its accounts to a new bank, PNC, in September 2018, where it continued the Ponzi scheme unabated.

19.     However, while a Heartland officer indicated under oath that it "closed" all accounts associated with TGC in October 2018, Courtright recently submitted an accounting to the Court in the SEC Action that shows he continued to make tens of thousands of dollars in payments from TGC's main account at Heartland for personal and business purposes long after Heartland supposedly closed that account.

20.     Heartland had actual knowledge of TGC's and Courtright's fraudulent conduct much earlier than September 2018, because of the wealth of information in its possession—including extensive information it obtained regarding TGC and its business in the course of providing crucial financial support to TGC to help it avoid collapse and to perpetuate the Ponzi scheme—and its close and continuing contacts with TGC and Courtright.

21.     Further, both Heartland and PNC had extensive knowledge of TGC's operations and financial transactions because—highly unusual for a Ponzi scheme—TGC conducted *all* its scheme largely through a single account at Heartland and a single account at PNC. Thus, Heartland and PNC were able to easily see (1) the entire Ponzi-like operation in each of those single accounts: deposits from new investors followed by transfers of those deposits, from that same account, to existing investors as distribution payments, and (2) the extensive and obvious misuse of investor money by Courtright for his personal benefit, including multiple payments, from TGC's account, for his children's private school tuition, his tax and credit card bills,

department store purchases, his home mortgage—which was also held by Heartland—and numerous other obviously personal expenses, ranging from wines to haircuts.

22.     Heartland and PNC had extensive knowledge of TGC's operations and the nature of the transactions in its Heartland and PNC accounts because TGC conducted its business—both the receipt of new investor money and the Ponzi-like payments of existing investors with the new investors' money—via wires and electronic money transfers, which were reviewed and processed manually by the bank employees in charge of administering TGC's accounts through which the fraud was conducted in the account ending in 5912 at Heartland and the account ending in 9798 at PNC. Many of those incoming wire transactions indicated on their face that the money that was being deposited in TGC's Heartland and PNC accounts was investment proceeds from investors, and was earmarked for a specific purpose: the construction or purchase of a website by TGC to be discretionarily chosen and managed by TGC and Courtright. *See also* Exhibit 8.

| Wire Amount and Source of Funds | | | |
|---|---|---|---|
| Create AU: ▮ | Amount (US Dollars): \$200,000.00 | Debit Wells Fargo Account: ▮ | Bank/COID: ▮ |
| **Beneficiary/Recipient Information** (This is the ultimate recipient of the wire transfer funds) | | | |
| Beneficiary/Recipient Name: TODAYS GROWTH CONSULTANT | | Name/Address Line 1: 212 SLALOM CT | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): ▮ 5912 | | Name/Address Line 2: MINOOKA, IL 60447 | |
| Purpose of Funds: INVESTMENT | | Name/Address Line 3: | |
| Additional Instructions: ▮ | | Beneficiary Phone Number: | |

**Wire Amount and Source of Funds**

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| | $250,000.00 | | |

**Beneficiary/Recipient Information** (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| Today's Growth Consultant | 1001 Millersville Road |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 9798 | Lancaster PA 17603 |
| Purpose of Funds: | Name/Address Line 3: |
| Funds being sent to invest funds in website | Lancaster, PA, US |
| | Beneficiary Phone Number: |
| Additional Instructions: | |

23.    Courtright made thousands of transfers from the Heartland 5912 account. Of those, Courtright made approximately 1,400 transfers out of the 5912 account totaling approximately $5,000,000. These included cash transfers to himself for fast food, the Courtright's mortgage payments to Heartland, insurance, automotive needs, marble and many more. During the same time, Courtright made approximately half as many transfers out of the 5912 account to pay what the Receiver identified as potential business related expenses. However, even those potential business related transfers are questionable. For example, many are round dollar payments to a credit card, generally ranging from $5,000 to over $95,000 each, sometimes paid just days or weeks apart.

24.    Thus, Heartland and PNC learned that TGC and Courtright were receiving investor money in their respective accounts at the two banks and as a result were those investors' fiduciaries; and were extensively misusing, misappropriating, and diverting those investors' money either to make Ponzi payments or for Courtright's personal benefit.

25.    Heartland also provided crucial financial assistance to TGC and Courtright's fraudulent scheme, without which TGC's Ponzi-like scheme—which vitally depended on new cash infusions to maintain distribution payments to existing investors and avoid collapse—would have ended much earlier. As early as 2012, Heartland started providing a vital financial

lifeline to Courtright to help him keep TGC afloat. Heartland's indispensable financial support of TGC continued, and in 2015, TGC established a loan relationship with Heartland when it provided a single pay bullet loan to TGC. Thereafter, Heartland made numerous loans to TGC, providing TGC's Ponzi-like scheme with crucial financial support that enabled the scheme to avoid collapse and continue to recruit new victims.

26.     Throughout the course of the banking and lending relationships between Heartland, TGC and Courtright, Heartland requested, received and became privy to substantial detailed information regarding the personal finances of Courtright and the financial condition and business operations of TGC that exceeded the level of knowledge and information that may otherwise be available to a bank and a commercial customer.

27.     Through its review of account 5912 and its execution of improper transaction orders from Courtright that clearly misused investor money for his personal benefit, Heartland saw how Courtright used the TGC account, which held investor money, as his personal piggybank, in blatant violation of his fiduciary duties to the TGC investors, year after year. Heartland not only failed to do anything to stop Courtright from using its accounts—which Heartland knew held investor fiduciary funds, not Courtright's personal money—to victimize his investors; it actively and knowingly assisted him, in a substantial departure from typical banking practices. Even more egregiously, as more fully detailed below, Heartland paid itself with investor money, directly from account 5912, for Courtright's personal mortgage that he owed to Heartland.

28.     Specifically, Heartland directly benefitted from Courtright's fraud, breach of fiduciary duty, and diversion of investor money, because it held mortgages for at least two of Courtright's personal properties, including his main residence, that at various times added up to

over $1 million, and followed Courtright's instructions for Heartland to make mortgage payments to itself with investor money, directly from TGC's account, far in excess of the regular monthly payments and on an accelerated *weekly* payment schedule, as more fully detailed below.

29. Similarly – and even more indefensibly given that Courtright and TGC came to PNC with a tainted background, after being terminated from Heartland – PNC's review of account 9798 and its execution of improper transaction orders from Courtright enabled PNC to see that Courtright was receiving investor, fiduciary money earmarked for a specific purpose—website purchasing—and was blatantly and clearly misusing, misappropriating, and diverting such money for his own personal purposes and to make Ponzi payments to investors with PNC's help. Rather than stop him or decline to help him misuse investor money, PNC executed his instructions to misappropriate over a million dollars in investor money for his personal expenses.

30. PNC also saw how Courtright and TGC were improperly commingling investor money with funds from "payday lenders" specializing in lending money to distressed businesses, and executed his orders to misuse investor, fiduciary money that had been earmarked for a specific purpose to repay those lenders.

31. PNC continued to assist Courtright and TGC even after it learned that TGC was being investigated. Egregiously, it continued to accept deposits from unsuspecting victims of the TGC scheme until days prior to producing TGC bank records to the SEC in late 2019.

32. Applicable banking regulations and sound banking practice required Heartland and PNC to "know their customers"—Courtright and TGC—and maintain a customer due diligence program to predict the types and volume of transactions Courtright and TGC were likely to conduct so that Heartland and PNC could identify any suspicious activity. Yet, with actual knowledge of TGC's fraudulent activity, Heartland and PNC continued to provide TGC

11

and Courtright with the banking support and account platforms needed to carry out the fraudulent scheme.

33. TGC was required to provide Heartland and PNC with its certified articles of incorporation, government-issued business license, and detailed financial statements. PNC and Heartland were required to review TGC's financial statements and to collect and review information from TGC about its business operations, the source of its funds, and the purpose of its accounts. PNC and Heartland were required to understand the types of transactions a customer should, and actually does make.

34. In addition, Heartland—which offered extensive financing to Courtright and TGC for years—had copies of the CPAs, TGC profit and loss statements, Courtright's personal financial statements, credit memos analyzing TGC's financial condition, and much more, and, though this wealth of information, actually knew TGC's business model and had and analyzed the data from at least 2015 to know that TGC and Courtright were conducting a Ponzi scheme, were receiving money from investors for a specific purpose, were those investors' fiduciaries, and were misdirecting their investors' money in breach of their fiduciary duties.

35. PNC and Heartland had to monitor TGC's accounts for anomalous or suspicious behavior and to assign TGC a "customer risk rating." Not only did Heartland and PNC have sufficient data to see indicia of fraudulent and illegal conduct throughout its relationship with TGC and Courtright, but it also had sufficient data to actually know that a Ponzi scheme was in progress and that it was facilitating the scheme.

36. Heartland belatedly closed TGC's accounts in September 2018, long after it learned of the misuse of investor money and breach of fiduciary duties by TGC and Courtright, but did not report the Ponzi scheme to TGC investors, thereby allowing the scheme to continue

unabated at TGC's new bank, PNC. PNC accepted a client—TGC—that had just been kicked out by another bank for operating a Ponzi scheme through that bank account, and quickly learned—as Heartland had learned before—that the money coming into TGC's PNC accounts was investor, fiduciary money earmarked for a specific purpose, and that TGC and Courtright were fraudulently misusing such money. Just like Heartland, PNC also learned from the pattern of deposits and payments, as well as from its processing of investor wires that explicitly disclosed TGC's business, that TGC was paying returns to existing investors from new Upfront Fees, in clear Ponzi fashion.

37.     Both Heartland and PNC knew that TGC's operations were not consistent with its business model, and that the vast majority of TGS's transactions through their accounts, and facilitated by the two banks, consisted of Ponzi payments. TGC's banking activity should have reflected its receipt of website revenues sufficient to pay the guaranteed investor returns, but that was not what Heartland or PNC saw. Both saw investor money entering TGC accounts, very little website revenue and payments of guaranteed returns from upfront fees from new investors and loans—all at odds with TGC's claimed business model and in violation of the CPAs.

38.     TGC and Courtright conducted the Ponzi scheme in plain sight of its bankers, who assisted them by facilitating the banking transactions necessary to accomplish the scheme and, crucially, in Heartland's case, offering them a vital financial lifeline that enabled them to continue their fraudulent activities and victimize new investors and profit from the scheme by improperly paying itself directly from the TGC account that it knew held investor money, for Courtright's mortgage payments owed to Heartland.

39.     The Ponzi scheme could not have been carried out without the substantial assistance of Heartland and PNC, both of which were well aware of TGC's business model

and knew that guaranteed investor payouts were made with up-front payments from new investors, not from website revenues and that TGC and Courtright were misusing investor money, in breach of their fiduciary duties.

40.     As Heartland and PNC knew from their dealings with TGC and Courtright and from the movement of funds over a period of years, (1) TGC was in the business of raising money from investors and investing and administering its investors' investments in a discretionary fashion, as their fiduciary, but (2) TGC's business model brought in little or no revenue from many investors' websites, made no sense and was not economically viable. Only new investor money and loans would allow TGC to meet its obligations to pay guaranteed returns to investors.

41.     Even the most cursory review of TGC's and Courtright's accounts revealed the Ponzi scheme and TGC and Courtright's misuse of investor money in breach of their fiduciary duties. Heartland and PNC were required to do more than a cursory review by a myriad of federal statutes and regulations. Heartland and PNC were required to "know their customer" and conduct adequate due diligence as to TGC, both at the "onboarding" stage and continuously throughout the banking relationship. The facts and sworn declarations in the SEC Complaint and the Receiver's Initial Report establish that Heartland and PNC knew precisely what TGC and Courtright were doing, but did nothing to stop them or to prevent additional investors from being defrauded when TGC's accounts were opened at PNC.

42.     As the banks which substantially assisted and facilitated the Ponzi scheme perpetrated by TGC and Courtright and their breach of fiduciary duties to their investors, and also breached their own duties to investors whose fiduciary, earmarked funds they knew they were holding, Heartland and PNC are liable to Plaintiffs and the other investors who

have been injured as a result of the banks' actual knowledge of and substantial assistance in TGC's and Courtright's fraud and fiduciary duty breach, and the banks' negligence.

43. Heartland's and PNC's assistance of Courtright's and TGC's Scheme had devastating consequences for the TGC investors. The Scheme was shut down by the SEC at the end of 2019, and the Court has appointed a Receiver to oversee the liquidation of the Scheme's remaining assets and the distribution of any proceeds to victims. Courtright was criminally indicted in February 2020. Most of the investors' money appears to be gone.

## JURISDICTION AND VENUE

44. This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs, Heartland and PNC are citizens of different states, the total amount in controversy exceeds $5 million, excluding interest and costs, and the class contains more than 100 members.

45. This Court has subject matter jurisdiction over Plaintiffs' individual claims under 28 U.S.C. § 1332(b) based on diversity of citizenship. The amounts in controversy for Plaintiffs' individual claims exceed $75,000, exclusive of interest and costs.

46. The Court has personal jurisdiction over Heartland because it aided and abetted TGC's and Courtright's Ponzi scheme and misappropriation of investor funds in Illinois. Courtright was a resident of Minooka, Illinois, where TGC was based and had employees.

47. The Court has personal jurisdiction over PNC because it aided and abetted TGC's Ponzi scheme and misappropriation of investor funds in Illinois. Courtright was a resident of Minooka, Illinois, where TGC was based and had employees.

48.     Venue is proper in this District under 28 U.S.C. § 1391 because Heartland and PNC are subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## PLAINTIFFS

49.     Plaintiff PLB Investments LLC, whose principals are Peter and Laura Boettcher, is a resident of Florida. Plaintiff entered into a CPA with TGC and invested $100,000 for a "single site" on September 13, 2018. Plaintiff wired $100,000 to Heartland Bank on September 14, 2018 to TGC account ending in 5912.

50.     Plaintiff John Kuehner is a resident of Pennsylvania. He entered into a CPA with TGC and invested $300,000 in August 2018. Plaintiff wired $300,000 to the TGC account at Heartland Bank ending in 5912; the account was titled "Todays Growth Consultant 212 Slalom Ct. Minooka, Il 60447." Plaintiff also invested $350,000 in 2019 and wired $350,000 to a TGC account maintained at PNC ending in 9798; the account was titled "Todays Growth Consultant 1001 Millersville Road."

51.     Plaintiff A.S. Palmer Investments LLC is a resident of California. Plaintiff entered into a CPA with TGC and invested $100,000 in May 2017 and another $100,000 in January 2018. The first investment of $100,000 was wired on or about May 24, 2017 to a TGC account maintained at Heartland Bank on or about May 24, 2017, and the second investment of $100,00 was wired on or about February 1, 2018, to a TGC account maintained at Heartland.

## DEFENDANTS

52. **Heartland**. Heartland is a subsidiary of Heartland Financial, Inc., a community-based financial holding company. Heartland's principal office is located at 401 North Hershey Road, Bloomington, Illinois 61704. Heartland is a community bank which touts its personal service to its customers. Its website states: "[W] when you need a personal or business loan, you'll avoid going through several layers of management. Management decisions are made locally every day at Heartland Bank, not by some out-of-state corporation." The website further states: "*Banking is personal. We build strong customer relationships by getting to know our customers and understanding their needs. The phrase 'small enough to know you, big enough to serve you' is what Heartland Bank is all about.*" (*Emphasis added*). Courtright was a customer of Heartland since 2008, and by 2012 was borrowing money from Heartland to prop up TGC. TGC initiated its direct loan relationship with Heartland in 2015.

53. **PNC**. PNC Bank, N.A., headquartered in Pittsburgh, Pennsylvania, is the sole domestic subsidiary bank of the PNC Financial Services Group, Inc, a bank holding company headquartered in Pittsburgh, Pennsylvania and incorporated under the laws of the Commonwealth of Pennsylvania. PNC is ranked as the 9th largest bank in the US by assets, the 5th largest by number of locations and 6th largest by deposits. TGC and Courtright opened accounts at PNC in approximately September 2018.

## RELEVANT THIRD PARTIES

54. **TGC**. Todays Growth Consultant LLC is a private corporation, organized under the laws of the State of Illinois, and is co-owned by Courtright and his wife. Courtright's residence serves as TGC's headquarters. TGC has never filed any registration

statement for a public securities offering, or Reg D notice for any private placement, with the SEC, which made its raising money from investors unlawful on its face. TGC also does business through a division called The Income Store, which occupies premises in Lancaster, Pennsylvania. TGC has claimed at various times to have offices in Naples Florida, and in Romania and recently announced plans to open offices in the Philippines and India. TGC cannot be named a Defendant in this action because of the Court's Order of December 30, 2019 (ECF No. 19), in *SEC v. Todays Growth Consultant Inc., et. al*, 19-cv-08454 (N.D. Ill.), staying any claims against TGC.

55. **Courtright**. Kenneth D. Courtright resides in Minooka, Illinois, and is the founder, co-owner and currently TGC's Chairman. From March 2009 through August 2019, Courtright was TGC's Chief Executive Officer and President. Together with his wife, who took over as President of TGC in or about August 2019, Courtright and his wife each own 50% of TGC's shares. Like TGC, Courtright cannot be named in this action because of the Court's Order of December 30, 2019 (ECF No. 19) in *SEC v. Todays Growth Consultant Inc., et. al*, 19-cv-08454 (N.D. Ill.), staying any claims against Courtright.

### OVERVIEW OF THE RELEVANT BANKING REGULATIONS APPLICABLE TO HEARTLAND AND PNC'S REVIEW OF TGC'S BACKGROUND AND ACCOUNTS

56. Heartland and PNC are subject to a myriad of banking regulations designed to prevent them from disregarding or assisting in fraudulent and illegal behavior by their customers. While those regulations do not give rise to a private cause of action by victimized investors, they are useful to understand the framework and circumstances pursuant to which the two Defendant banks had to learn about TGC's business and

background, and the types of details that the two Defendants had to learn about TGC's account-related activities.

57.     Ponzi schemes, money laundering and other fraudulent activities generally cannot be carried out without processing the fraudulent transactions through a financial institution. For this reason, federal law requires banks to know their customers and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

58.     Heartland and PNC are obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

59.     The BSA requires Heartland and PNC to develop, administer, and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

60.     Heartland and PNC also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program

allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

61.     Customer due diligence ("CDD") programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity. Banks like Heartland and PNC are required to conduct customer due diligence both at the onboarding stage and continuously throughout the banking relationship with the customer.

62.     Banks such as Heartland and PNC are required to designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

63.     The federal government established the Federal Financial Institutions Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual (FFIEC Manual) summarizes BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC Manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC),

and the Office of the Comptroller of Currency. See FFIEC BSA/AML Examination Manual, at p. 5 (2010).

64.     Banks must also ensure that their employees follow BSA guidelines. Banks must make compliance a condition of employment and incorporate compliance with the BSA and incorporate its implementing regulations into job descriptions and performance evaluations. Banks are therefore required to train all personnel whose duties may require knowledge of the BSA and that statute's requirements.

65.     Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of suspicious or improper behaviors set forth in the FFIEC BSA/AML Examination Manual or otherwise, including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

66.     Having in its possession the CPAs, financial information about TGC and Courtright and all of their banking transactions, Heartland had actual knowledge of TGC's

and Courtright's Ponzi scheme acquired in part through its discharge of its BSA/AML-related duties, Heartland facilitated and substantially assisted the scheme in violation of its obligations under federal laws and regulations. Heartland did nothing for years, starting by no later than 2015, to stop the TGC scheme. Its self-serving, belated reporting in September 2018 —when its own exposure to investor claims must have become overwhelmingly clear given that it had helped Courtright and TGC raise and misuse tens of millions of dollars in investor money including hundreds of thousands of dollars that went to itself for Courtright's private residence's mortgage—amounts to "too little too late."

67.     Similarly, throughout its relationship with TGC and Courtright, starting when TGC's longstanding banking relationship with Heartland ended abruptly in September 2018, PNC was obligated to "know its customer," including its business model, its banking history and whether its banking transactions were consistent with its business model. From the beginning of TGC's banking relationship with PNC and throughout the approximately 15 months of the relationship, PNC had sufficient information to determine that it was facilitating a Ponzi scheme and the misuse and misappropriation of investor money. PNC knew of the fraudulent conduct, which was occurring in plain sight under its watch, but did nothing to stop it or at least stop assisting it.

68.     Indeed, even after PNC learned of the federal authorities' investigation of TGC, it continued to do business with TGC and Courtright and, most egregiously, accepted new investments from new unsuspecting victims until shortly before the filing of the SEC Action.

## FACTUAL ALLEGATIONS

### TGC's Phony Consulting Performance Agreements

69.     Since at least 2013, TGC has offered and sold approximately 700 unregistered investment contracts—CPAs—to approximately 500 investors across the United States and the world. From at least January 1, 2017 through October 2019, TGC marketed its CPAs through, among other ways, Sirius XM Satellite radio advertisements, online advertisements including on the website www.bizbuysell.com, and also through its own website www.todaysgrowthconsultant.com and that of its division, The Income Store, www.incomestore.com.

70.     The CPAs obligate TGC to acquire or build revenue-generating websites for the investor and then to develop, market and maintain the websites. In turn, the CPAs require investors to (i) pay a so-called "Upfront Fee" and (ii) give TGC password access to the investors' websites. TGC purports to use the Upfront Fee to fund its obligations under the agreements. Since at least 2017, TGC has structured its CPAs to provide passive income to investors who are not obligated to expend any effort beyond the payment of their initial investment amount. TGC led investors to believe that they could expect profits solely from TGC's expertise and performance of its obligations under the CPAs.

71.     TGC promises its investors a guaranteed minimum return on their investment. Specifically, the terms of the CPAs provide that investors are entitled to receive, in perpetuity, a monthly payment equal to 50% of the revenues generated by their websites. The threshold amounts vary from agreement to agreement but typically are a percentage of the investor's Upfront Fee, converted to a monthly dollar equivalent.

72.     TGC's performance guarantee is accompanied by its express representation in the CPAs that it "is in satisfactory financial condition, solvent, and able to pay its bills when

due and financially able to perform its contractual duties hereunder." TGC's website also represents that the company is "debt free."

73. TGC's CPAs restrict TGC's use of investor funds. TGC agrees to "use the Upfront Fee exclusively" for purchasing or building, hosting, maintaining, and marketing of the investor' s website(s). Further, though TGC may use subcontractors who share in website revenue, the agreements make clear that TGC will pay subcontractors only from its 50% share of the website revenue. Heartland was aware of these facts. According to Heartland, in connection with TGC's September 2017 extension request, *see* Exhibit 1 attached hereto, Heartland received copies of certain CPAs that TGC had recently entered into with customers who appeared on TGC's accounts receivable list, and those contracts entitled TGC to 50% of website revenue and provided the customer with a guaranteed revenue stream even if revenues were not sufficient.

74. Courtright reviewed and approved CPAs before they were signed and sometimes signed the agreements on behalf of TGC. Courtright, a public spokesperson for TGC, was familiar with the terms of the CPAs, including the guaranteed returns, the restriction on TGC' s use of funds and the representations about TGC's solvency and financial ability to satisfy its guarantee obligations.

75. TGC failed to timely purchase or build the websites it promised to build under the CPAs, and failed to generate the types of revenues it had promised to investors under the CPAs, while at the same time, it paid investors the guaranteed returns provided for under those agreements. For example, upon information and belief, the experience of investor Gregg Parnell is typical of those entering into CPAs with TGC. According to the

Declaration of Gregg Parnell on August 28, 2017,[3] Parnell signed a CPA with TGC. *See* Exhibit 2 attached hereto. The CPA provides that TGC shall, among other things, "purchase and maintain two Revenue Generating Websites" and "create and maintain an Authority Site" (collectively referred to as "The Sites"). The agreement defines "Revenue Generating Site" in part as "an existing website to be purchased and managed by [TGC] on behalf of [the investor] to provide return on investment cash flow … and to provide an ongoing complimentary revenue stream." It defines "Authority Site" in part as "a website built to be a leading website for its topic or industry."

76.     The CPA states that approximately 25% of the Upfront Fee will be used to acquire two Revenue Generating websites and that those sites will be acquired "within the first 16 weeks of the contract." It also states that, within six months after execution of the agreement, TGC may suggest building an additional two sites, at no additional cost to Parnell.

77.     The CPA states that B2BI, Inc. is the owner of the "Sites," that TGC shall be entitled to 50% of the ad revenues, rented page placement and referral fees generated from the Sites, and that B2BI is entitled to the remaining 50%. It further states that "[t]he longest it can take for a site partner to receive their first distribution is ten weeks after site purchase."

78.     The CPA includes a "Performance Guarantee," pursuant to which TGC has agreed to pay Parnell, each month for the next 60 years, the greater of $3,896 (equivalent to 17% of Parnell upfront fee when annualized) or 50% of monthly gross revenues from the Sites. The CPA states that TGC shall begin making monthly payments on January 15, 2018.

---

[3] Declaration of Gregg Parnell, attached to the SEC Complaint ("Parnell Decl.") (ECF No. 16).

The guarantee is accompanied by a representation and warranty that TGC "is in satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties hereunder."

79.     The CPA restricts TGC's use of Parnell's Upfront Fee by providing that that TGC "shall use the Upfront Fee exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website and the building, hosting, maintenance and marketing of the Authority Site" for Parnell's benefit.

80.     At some point after signing the CPA, Parnell was assigned a "Client Communication Specialist" ("CCM"), who became his principal contact with TGC/Income Store.

81.     On January 15, 2018, approximately 18 weeks after Parnell entered into his CPA, but before any websites had been purchased for him, TGC began making monthly payments to Parnell of $3,896, the minimum guaranteed return set forth in the CPA.

82.     On March 16, 2018, Parnell's CCM informed him by email that his Authority Site, http://nerve-injury.com, was "live," which Parnell understood to mean that his Authority Site was accessible on the Internet. Parnell believed the site was in a ramp-up stage, was not fully developed and he did not see any advertisements or other links that could potentially generate revenue for the site.

83.     On or about April to May of 2018, Parnell became concerned that TGC was not adding content to his Authority Site or making any effort to drive traffic to the site. He periodically visited his Authority Site to see what, if any, progress had been made. He was also able to log in to a dashboard to see website traffic statistics, and it appeared to him that there was little traffic to the site and it was not generating revenue.

84.     By the end of May 2018—more than 38 weeks after Parnell executed his CPA—TGC still had not purchased a Revenue Generating Website on his behalf.

85.     In the spring of 2018, Parnell had several conversations and exchanged several emails with his CCM in which he expressed his concerns. On May 30, 2018, his CCM informed him that new content could not be added to the Authority Site because it was "still indexing with Google." In a phone conversation that occurred sometime after May 30, 2018, Parnell's CCM stated that TGC had not purchased any Revenue Generating Websites because TGC/Income Store was behind due to high demand.

86.     At the end of September 2018, more than a year after Parnell executed the CPA, TGC had yet to purchase a Revenue Generating Website on his behalf, there were still no advertisements or links on his Authority Site, and the Authority Site did not appear to be generating any revenue. Nonetheless, Parnell continued to receive monthly payments of $3,896.

87.     At the same time, Parnell continued to hear radio advertisements on Sirius Satellite XM radio for Income Store, and believed that TGC/Income Store was continuing to seek new investors.

88.     Parnell routinely asked for evidence showing the amount of revenue his Authority Site and his e-commerce site were generating. TGC/Income Store generally did not respond to his inquiries. On August 28, 2019, Parnell received an email from his CCM that included a "Contract Earnings Dashboard," below, which Parnell understood to list the revenues generated from his websites in 2019.[4] The dashboard indicated that his Authority Site had $0 in revenue,

---

[4] *See* Ex. 14 to Parnell Decl. (ECF No. 16)

and that his e-commerce site had negative revenues. His CCM wrote that revenues were negative because TGC was spending "more in advertising dollars to generate traffic to the website."

## 2019 Contract Earnings Dashboard

| Website Performance Under This Contract | Partner Payments Made | 2019 | Monthly Total ALL Websites | narve-injury.com | roottv.com |
|---|---|---|---|---|---|
| | $3,896.00 | January | $0.00 | $0.00 | $0.00 |
| Contract Name : Gregg_Parnell_01 | $3,896.00 | February | $0.00 | $0.00 | $0.00 |
| Contract Owner(s) : Gregg Parnell | $3,896.00 | March | $0.00 | $0.00 | $0.00 |
| Contract Amount : $275,000.00 | $3,896.00 | April | $0.00 | $0.00 | $0.00 |
| Contract Date : 9/7/2017 | $3,896.00 | May | $0.00 | $0.00 | -$1,042.35 |
| Min. Payment to Partner : $3,896.00 | $3,896.00 | June | $0.00 | $0.00 | -$3,192.00 |
| Min. Earnings for Overage : $7,792.00 | $3,896.00 | July | $0.00 | $0.00 | $0.00 |
| Contract Type : Hybrid Triple | $3,896.00 | August | $0.00 | $0.00 | $0.00 |
| Link to Contract : Contract | | September | $0.00 | $0.00 | $0.00 |
| Annual Rate of Return : 17.0% | | October | $0.00 | $0.00 | $0.00 |
| Overage Split: 50/50 | | November | $0.00 | $0.00 | $0.00 |
| | | December | $0.00 | $0.00 | $0.00 |
| | $31,168.00 | YTD TOTAL | $0.00 | $0.00 | -$4,234.35 |

89.     Without generating any website revenues, from January 2018 through November 2019, TGC paid Parnell the minimum guaranteed return of $3,896 each month, for a total of $89,608.

90.     TGC never acquired a second Revenue Generating Website, as required by Parnell's CPA and, as of December 2019, his Authority Site has never generated any revenue and his e-commerce site generated insignificant revenues that do not come close to covering the minimum monthly payout which Parnell received from TGC.

### TGC's Investor Payouts Far Exceeded Website Revenue

91.     Parnell's experience was typical of CPA investors. From at least January 2017 through October 2019, investor websites, collectively, generated revenues that were materially below the threshold amounts guaranteed by TGC. TGC nonetheless paid investors their guaranteed returns, monthly, until December 2019, when it put a moratorium on investor payouts.

28

92.     The SEC's analysis of TGC's financial statements and bank records from Defendants determined that TGC's business model was not viable, that TGC was not in satisfactory financial condition and that TGC was not able to perform its contractual duties under its CPAs.[5]

93.     The SEC staff's forensic analysis of TGC's financial condition and cash flows, showed that, from at least January 2017 through December 2019, TGC's investor websites generated substantially less revenue than the guaranteed amounts specified in the CPAs, which TGC had been paying. Specifically, from January 1, 2017 through at least October 31, 2019, investor websites generated approximately $9 million in advertising and product sales revenue, yet during the same period, TGC paid investors at least $30 million.

94.     TGC's financial statements and bank records, all of which were in the possession of and analyzed by Heartland and PNC, show that TGC funded the gap between website revenues and its guaranteed investor payouts primarily through the offer and sale of CPAs to new or repeat investors.

95.     The SEC analysis of TGC bank records from Defendant PNC indicates that beginning in May 2019, TGC added loans to fund its obligations to its investors. However, TGC continued to raise funds from new investors and improperly co-mingled investor funds with loan proceeds in PNC's account, then instructed PNC to use the co-mingled funds to both make Ponzi-like payments to existing investors and to begin to repay its loans.

96.     Courtright was an authorized signatory on each of TGC's bank accounts at Heartland and PNC.

---

[5] Declaration of Jeffrey R. Anderson ("Anderson Decl."), filed in the SEC Action. (ECF No. 17)

97.     The SEC's analysis of TGC's bank records from August 2018 through October 2019, showed that TGC raised an estimated $87,647,273 from individuals and entities between January 2017 and October 2019 as reflected in the below chart:

| Investor Funds Raised | |
|---|---|
| | *"Upfront Fees" from Consulting Performance Agreements* |
| 2017 | $16,440,606 |
| 2018 | $42,265,241 |
| 2019 (Jan. – Oct.) | $28,941,426 |
| **TOTAL:** | **$87,647,273** |

98.     The SEC identified $16,836,807 in payments from TGC to investors from August 2018 through October 2019, of which $4,646,718 were payouts to investors made during the period August 2018 through December 2018, and $12,190,089 were payouts made during the period January 2019 through October 2019.

99.     In total, using a combination of TGC's financial statements and SEC analysis, the SEC concluded that TGC paid its investors more than $30 million between January 2017 and October 2019. This is a conservative number that likely materially underestimates the amounts TGC paid to persons and entities who entered into CPAs over the years.

| Investor Payouts | |
|---|---|
| **Year** | *Investor Payments* |
| 2017 | $8,303,225 |
| 2018 | $10,654,449 |
| 2019 (Jan. – Oct.) | $12,190,089 |
| **TOTAL:** | **$31,147,763** |

100.     Using a combination of TGC's financial statements and SEC analysis, the SEC concluded that TGC earned "website revenue" of approximately $9 million between January 2017 and October 2019.

| Website Revenue | |
| --- | --- |
| Year | Ad Revenue and Product Sales Revenue |
| 2017 | $2,784,507 |
| 2018 | $2,369,677 |
| 2019 (Jan. – Oct.) | $3,847,948 |
| TOTAL: | $9,002,132 |

101.     From January 2017 through the present, TGC has generated income principally from two sources: (i) website revenue (consisting of revenue from advertising and product sales on investor websites); and (ii) "upfront fees" from new Investors.

102.     From January 2017 through October 2019, TGC paid more than $30 million to investors *while generating approximately $9 million, in website revenues. Thus, TGC had a roughly $22 million dollar gap between website revenues and its guaranteed payments to investors.*

| Investor Payouts vs. Website Revenue | | | |
| --- | --- | --- | --- |
| Year | Investor Payouts | Website | Shortfall |
| 2017 | $ 8,303,225 | $2,784,507 | $5,518 ,7 18 |
| 2018 | $ 10 , 654 ,449 | $2 , 369,6 77 | $8,284,772 |
| 2019 (Jan.-Oct.) | $ 12, 190, 089 | $3,847,948 | $8,342,14 1 |
| TOTAL: | $31,147,763 | $9,002,132 | $22,145,631 |

103.     TGC's financial statements and bank records from Defendants Heartland and PNC show that, from at least January 2017 until at least May 2019, other than the Upfront Fees it received from new investors who entered into CPAs during that period, TGC did not

have any other source, that by itself or when combined with other sources, was sufficient to fund TGC's payments to investors. Since TGC made the payments, it necessarily funded the payments from some source. Based on TGC's financial statements and SEC analysis of TGC's bank records, the SEC concluded that TGC could not have paid investors without using money from new investors from January 2017 until at least May 2019.

104.    The SEC observed a number of sizable incoming credits on TGC's bank records at PNC, during the period from May 2019 through October 2019, from various individuals and entities that the SEC determined are likely lenders. Several individual and entities that the SEC classified as lenders appear to specialize in providing financing to distressed companies.

105.    From May 2019 through October 2019, TGC's bank accounts at PNC reflect more than $12 million in incoming loan proceeds. TGC deposited the proceeds in its principal account at PNC where it improperly co-mingled the loan proceeds with money that PNC knew was coming from investors and was earmarked for a specific purpose.

106.    During *the period May 2019 through October 2019, from that PNC account of co-mingled assets, TGC paid $7,944,207 in guaranteed returns to investors and approximately $3,768,505 in payments to the lenders from which it had just received funds. Website revenue was only $2,369,677.*

| Investor Payouts v. Website Revenue | | | | |
|---|---|---|---|---|
| | **Website Revenue** | **"Upfront Fees" from Consulting Performance** | **Net Loans** | **Investor Payouts** |
| **2017** | $2,784,507 | $16,446,606 | - | $8,303,225 |
| **2018** | $2,369,677 | $42,265,241 | - | $10,654,449 |
| **2019 (Jan.-Apr.)** | $1,434,395 | $12,256,185 | - | $4,245,882 |
| **2019 (May-Oct.)** | $2,413,553 | $16,685,241 | $8,476,310 | $7,944,207 |
| **TOTAL:** | $9,002,132 | $87,647,273 | $8,476,310 | $31,147,763 |

**Defendants Complied with Courtright's Instructions to Pay His Personal Expenses
with Investor Funds Deposited in the Accounts They Held for TGC**

107.    The SEC identified more than $1.5 million transferred from TGC's bank accounts

at Heartland and PNC to Courtright between January 2017 and October 2019. These funds were

either paid to Courtright, transferred to Courtright's personal accounts (including accounts held

jointly with his wife), or paid to entities controlled by Courtright. TGC made these transfers from

bank accounts into which TGC had also deposited Upfront Fees from its investors. Exhibit 3

contains copies of bank records reflecting a sample of these transactions.[6] Exhibit 4 contains a

sworn accounting by Courtright that identifies all transactions transferring funds or any assets

from TGC to Courtright since 2013.[7] Exhibit 5 contains a sworn accounting by Courtright of

transactions exceeding $10,000 since January 1, 2019.[8]

108.    The SEC also identified more than $323,000 transferred from TGC's principal

bank account at Heartland, which Heartland knew received new investor, fiduciary funds

earmarked for a specific purpose, the acquisition of websites, to the mortgage account, also held

by Heartland, for Courtright's personal residence between January 2017 and October 2018.

During this period, Heartland paid itself, at TGC's instructions, ***$3,000 each week*** from the

TGC's Heartland business account to Courtright's Heartland mortgage account . Exhibit 6

contains copies of bank records reflecting a sample of these transfers.[9] *The transfers from the*

*TGC Heartland business account to Courtright's Heartland mortgage account were in amounts*

---

[6] *See* Ex. 2 to Anderson Decl. (ECF No. 17).

[7] *See* Ex. B to Sworn Accounting Pursuant to 28 U.S.C. § 1746 filed in the SEC Action. (ECF
No. 44) ("Sworn Accounting").

[8] *See* Ex. C to Sworn Accounting.

[9] *See* Ex. 3 to Anderson Decl. (ECF No. 17).

*that exceeded Courtright's monthly mortgage obligation. Specifically, as of September 2017, Courtright's mortgage loan required monthly principal and interest payments of only $2,729, but, between January 2017 and October 2018, TGC generally made weekly payments of $3,000 to pay down Courtright's personal residential mortgage.*

109.    The SEC and Courtright also identified a large number of improper payments made by Heartland and PNC at TGC's direction, from an account that Heartland and PNC knew received investor money earmarked for a specific purpose, that are clearly Courtright's personal expenses. Over $36,851 in credit card expenses, along with tens of thousands of dollars of other improper personal payments, was paid by the two Defendants for Courtright's benefit with earmarked, fiduciary money Defendants knew had been deposited by investors.

110.    For example, Heartland paid, at TGC's direction, more than $12,000 in tuition to a private secondary school in 2018. In 2019, PNC, at TGC's direction, paid more than $24,000 to the same school. Exhibit 7 contains copies of bank records reflecting these transactions.[10]

111.    Through October 2018, Heartland, at Courtright's instructions, improperly transferred approximately $383,200 of investor money from TGC's account to itself for mortgage payments for Courtright's personal residence. The transfers were in amounts that far exceeded Courtright's monthly mortgage obligation. Specifically, as of September 2017, Courtright's mortgage loan required monthly principal and interest payments of $2,729, but, between January 2017 and October 2018, Heartland generally made *weekly* payments of $3,000 to itself, from TGC's account that held

---

[10] *See* Ex. 4 to Anderson Decl. (ECF No. 17). *See also* Exhibits 4 and 5 attached hereto (Exhibits B and C to Sworn Accounting).

earmarked, fiduciary investor money, to pay down Courtright's personal residential mortgage on an accelerated schedule.

112.    The SEC recently reviewed TGC's PNC bank records for the month of November 2019 to determine whether TGC continued to raise funds from new investors. The SEC determined that TGC raised approximately $1.8 million from investors during November 2019. TGC also received loan proceeds of more than $2 million in November 2019, but made loan payments of more than $2.5 million in that month. The investor funds and loan proceeds were deposited into TGC's co-mingled account at PNC.

**TGC and Courtright Acted with the Requisite Scienter**

113.    From at least January 2017 through the present, TGC and Courtright have knowingly engaged in a scheme to defraud investors and to obtain money by means of materially false and misleading statements to investors.

114.    Courtright knew that TGC used upfront fees from new investors to pay guaranteed returns to existing investors. Courtright executed CPAs on behalf of TGC and knew those agreements, consistent with TGC's offer to prospective investors, provided a minimum guaranteed return on their investment without regard to the performance of their websites. He had signature authority on TGC's bank accounts at Heartland and PNC and access to the accounts.

115.    Courtright admitted knowledge of the scheme in September 2018, when he told Heartland representatives that TGC had paid and would continue to pay the guaranteed returns to existing investors by using incoming funds from new investors, until either advertising revenue increased or an alternative revenue stream was adopted.

116. Other TGC executives also knew that TGC was using investor money to pay existing investors. In August 2018, in response to questions from Heartland, TGC's Controller stated to Heartland representatives that when website revenue is insufficient to make guaranteed investor payouts, TGC uses incoming money from new investors. Despite this knowledge, TGC and Courtright nonetheless continued to engage in the unregistered offer and sale of CPAs and to use the proceeds to pay existing investors.

## Heartland and PNC Acted with the Requisite Scienter

117. Heartland's and PNC's action and inaction were integral to TGC's and Courtright's scheme to defraud investors. It was through Heartland and PNC account transactions that Courtright applied new investor funds to pay existing investor returns and diverted millions in investor funds for his own personal expenses.

118. TGC and Courtright could not have carried out the scheme without continually raising large amounts of money from investors and paying guaranteed investor returns to existing investors from those incoming investor funds. Courtright used Heartland and PNC to deposit new investor money, in many cases clearly marked as an investment in websites, and then pay guaranteed returns to existing investors, in classic Ponzi fashion, instead of paying guaranteed returns with income earned from operating websites, as promised.

119. TGC and Courtright could not have carried out the scheme without either (a) using a complex array of accounts at different banks, so that no single bank would be able to detect the ongoing fraud; or (b) enlisting a single bank—here, first Heartland and then PNC—to facilitate the Ponzi scheme. Because TGC and Courtright used a single bank at a time and one main account at each bank, both Heartland and then PNC knew and could readily determine that

36

the TGC business model did not work because website revenues being deposited at each bank were grossly insufficient to pay the guaranteed investor returns and those returns were being paid from new Upfront Fees. The duration of the Ponzi scheme for years provided sufficient evidence of the pattern of deposits and payments for both Heartland and PNC to know that a Ponzi scheme was in progress. Both Heartland and PNC had sufficient evidence and other indicia of wrongdoing to know about the Ponzi scheme, yet both banks looked the other way from the fraud being perpetrated in plain sight within their accounts. Both Heartland and PNC knew they were receiving fiduciary money from investors in TGC and that such money was being misused and misappropriated. They both knew that Courtright and TGC, the fiduciaries of their investors, were breaching their fiduciary duties to investors through their misuse of investor funds.

120.    TGC and Courtright could not have continued to carry out their scheme without Heartland's crucial financial support, in the form of loans and credit, which enabled TGC to avoid collapse and continue to victimize new investors and PNC's crucial support, permitting the scheme to continue for an additional 15 months after Heartland closed TGC's accounts.

### Heartland Facilitated the TGC Ponzi Scheme Despite Knowledge of and Numerous Indicia of Wrongdoing by Courtright and TGC

121.    Thomas Kentner ("Kentner") served as Heartland's loan officer on all of Heartland's loans to TGC and to Courtright personally from approximately 2015 until all of TGC's accounts were closed in October 2018. Heartland, through its agents and representatives, knew that TGC and Courtright were conducting a Ponzi scheme, were receiving fiduciary funds from investors, and were misusing and misappropriating such funds.

122.    On December 17, 2019, Kentner executed a declaration, sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, which was filed in support of the SEC's Action against TGC and Courtright ("Kentner Declaration"). *See SEC v. Todays Growth Consultant Inc., et. al,*

19-cv-08454 (N.D. Ill.), at ECF No. 15. The allegations in Plaintiffs' complaint relating to Heartland's actual knowledge of the Ponzi scheme are primarily drawn from the sworn Kentner Declaration and the exhibits thereto.

123.    TGC established business and lending relationships with Heartland beginning as early as 2015. Specifically, Courtright became a customer of Heartland in his personal capacity as early as 2008. In 2014, Heartland financed the mortgage balance of Courtright's residence (from which he and his wife also ran TGC), and later gave Courtright another mortgage loan for a condominium in downtown Chicago. Beginning with TGC's first application to Heartland for a loan in March 2015 and continuing through TGC's 2017 requests to extend its line of credit at Heartland, Courtright informed Heartland that he operated TGC from his primary residence on which Heartland held the mortgage notes.

124.    Heartland, through at least Kentner, reviewed TGC's applications for loans, lines of credit, and extensions; reviewed and analyzed any related documentation, including, but not limited to, TGC's financial statements; and Kentner spoke with Courtright and other officers of TGC to gather additional information that would impact Heartland's willingness to extend credit to TGC.

125.    Heartland, through at least Kentner, made assessments of TGC's creditworthiness as a commercial credit applicant, and prepared Commercial Loan Credit Memos ("Credit Memos"), which Heartland used to approve or deny TGC's loan requests and to establish the terms under which Heartland was willing to extend credit.

126.    In March 2015, TGC sought a loan from Heartland to cover what Courtright described to Heartland as a cash-flow deficit created by a delay in the receipt of a wire from one

of TGC's customers. Heartland approved the application and extended a 30-day loan to TGC in the amount of $66,886 in March 2015.

127.     In June 2015, TGC again sought a loan from Heartland to cover a cash-flow deficit created by a delay in the receipt of a wire from one of TGC's customers. Heartland approved the application and extended a 30-day loan to TGC in the amount of $90,000 in June 2015.

128.     In June 2015, TGC applied for a $200,000 revolving line of credit from Heartland to fund its accounts receivable. Heartland approved TGC for a $200,000 revolving line of credit to fund accounts receivable in July 2015.

129.     In connection with TGC's June 2015 application for credit, Courtright made representations to Heartland concerning the nature of TGC's business. Among other things, Courtright represented to Heartland that TGC was in the business of discretionarily building and/or buying revenue-generating websites for investors to invest in such websites, managing their investors' money and digital assets as it deemed fit, pursuant to its advertised extensive expertise, and then splitting the profits it supposedly generated from such websites with their investors. Through this process, Heartland learned that, according to Courtright, TGC had three website models that prospective investors could choose from. Of those, Courtright represented the "Hands Off" model, in which the investor funded the purchase of a revenue-generating website, which TGC then exclusively and discretionarily managed without further customer involvement, was its most profitable.

130.     When TGC applied for a $200,000 revolving line of credit from Heartland to fund its accounts receivable in June 2015, Courtright represented to Heartland that the company had a "cash-flow" gap. Specifically, Courtright represented to Heartland that the company was looking

39

for a permanent solution to TGC's cash-flow gap that resulted from a discrepancy in timing between an investor signing a contract, TGC purchasing a website for the investor and starting to manage it, and TGC's receipt of the investor's funds and its receipt of ad revenues from the websites.

131.    TGC's June 2015 line of credit matured in 1 year and was renewed in July 2016.

132.    In April 2017, before TGC's July 2016 line of credit matured, TGC applied to Heartland for a $200,000 short-term (45-day) loan to cover a cash-flow gap that TGC's then-existing $200,000 revolving line of credit was unable to cover.

133.    As of April 2017, TGC had drawn $180,000 of its existing line of credit. Courtright represented to Heartland that TGC expected a $522,000 receivable by the end of April and expected approximately $3.5 million in product sales at its late-April 2017 annual convention but, in the interim, it needed funds for payroll, payroll taxes, and advertising. Courtright also informed Heartland that, in the future, TGC would like to increase the revolving line of credit to $500,000 to eliminate the need for short-term loans in addition to the revolving line of credit.

134.    When TGC's 2016 line of credit matured in August 2017, Courtright sought to renew TGC's $200,000 line of credit. As part of the process of determining whether to renew, and on what terms, Heartland directed Courtright to provide Heartland with TGC's current financial statements.

135.    In August 2017, Courtright also informed Heartland that TGC had recently terminated its accountants, Michael Tunney of Tunney & Associates, P.C., in Orland Park, Illinois, due to "performance-related issues" and hired two new accountants. Courtright also

represented to Heartland that TGC's new accountants were in the process of updating TGC's 2016 and YTD 2017 financial statements.

136.     Heartland "was not comfortable" extending TGC's line of credit for a full year without first reviewing and discussing with Courtright TGC's updated financials and performance and TGC's future business plans. However, in August 2017, Heartland extended TGC's line of credit for a three-month period, rather than the full year, as TGC had requested.

137.     In a September 22, 2017, Credit Memo, Heartland stated that TGC had "recently hired two new accountants, David Olsen and Bill Longcore, who were previously CPA's (sic) with Arthur Andersen LLP. Mr. Olson was TGC's previous accountant prior to 2016." Heartland also stated that "Mr. Olson and Mr. Longcore are currently re-working through TGC's 2016 financial statements and YTD 2017 financial statement, *as there were discrepancies from the previous accountant.*" (Emphasis added.) Exhibit 1 contains a copy of the September 22, 2017 Credit Memo.

138.     Heartland subsequently renewed TGC's line of credit three additional times, for periods of three months each, while TGC was updating its financial statements. In connection with each extension request, Courtright continued to make representations to Heartland concerning TGC's business. For example, in September 2017, in connection with TGC's application to extend Heartland's line of credit for another three months, Courtright informed Heartland that the Hands Off model then accounted for 80% of TGC's revenue and he soon expected it to be TGC's "sole focus."

139.     Courtright told Heartland that the Hands Off model was the reason for TGC's "exponential growth." He also stated that, under new contracts, TGC received 85% of website

revenue, as opposed to its previous 50%, and that TGC's website portfolio was netting revenue of $410,000 per month and growing $20,000 per month.

140.    Heartland's Credit Memo dated September 22, 2017, reflects Heartland's ostensible belief that TGC's website portfolio was netting $410,000 per month and growing. Yet, the Credit Memo also reflects Courtright's liquid net worth of just $2,422,000.

141.    In connection with TGC's September 2017 extension request, Heartland received copies of CPAs that TGC had recently entered with its investors on TGC's accounts receivable list. According to those CPAs, TGC was entitled to 50% of website revenue and provided the investor with a guaranteed revenue stream even if revenues were not sufficient.

142.    The CPAs that TGC provided to Heartland in 2017 reflected starkly less revenue to TGC—50%—than the 85% that Courtright had represented to Heartland. They also confirmed TGC's business model and the fact that it was raising money from investors by selling them unregistered "investment opportunities" or securities, and that the money Heartland was receiving in TGC's accounts was fiduciary money that belonged to TGC's investors and that was earmarked for the purchase and operations of websites and could only be used for that purpose.

143.    On August 7, 2018, TGC's Chief Financial Officer ("CFO") provided Heartland with TGC's updated balance sheets and profit and loss statements for calendar year 2017 and January through July of 2018. Thereafter, Heartland had several communications with Courtright, TGC's CFO, and TGC's Controller "in order to better understand the statements and what they reflected about TGC's business."

144.    According to Heartland, with respect to the profit and loss statements, TGC's officers informed Heartland that: (a) the line item "website advertising" represents advertising revenue generated by all of the websites TGC manages for its customers (which TGC also refers

42

to as "partners" and "investors"); (b) the line item "development revenue" represents incoming monies from its customers; and (iii) the line item "website payouts" represents the total amount that TGC paid to its customers.

145.    TGC's 2017 Profit and Loss Statement showed, among other things, that, in fact, TGC was operating at a loss of more than $2 million for the year and that website advertising revenue and product revenue were less than $3 million combined, while its "website payouts" to customers were more than $8 million. TGC's own Profit and Loss Statements provided that TGC was not, in fact, netting $410,000 per month and growing.

146.    TGC's Profit and Loss Statement for the period January 1, 2018 through July 31, 2018, also showed, among other things, that TGC was operating at a loss and that website advertising revenue and product revenue were less than $1 million combined, while "website payouts" to investors were more than $6 million.

147.    TGC's Profit and Loss statements also showed that, between 2017 and 2018, TGC's "development revenue" was on pace to grow from $16,440,606 in 2017 to $28,581,000 on an annualized basis in 2018. It was clear from the profit and loss statement that TGC could not have made "website payouts" to investors in the amounts that were reflected in TGC's profit and loss statements without using its "development revenue."

148.    On August 29, 2018, Heartland participated in a conference call with TGC's Controller and Joe Brock of Heartland. In that conversation, Heartland stated their observation that, among other things, TGC's advertising revenue had decreased from $2,707,000 in 2017 to $574,000 from January through July 2018, or $984,000 when annualized. In addition, Heartland stated its observation that TGC's "website payouts" to customers had increased from approximately $7 million in 2017 to approximately $9.5 million in 2018, when annualized.

Accordingly, TGC's revenue was on pace to decrease 74% in 2018, while its financial obligations to its investors were on pace to increase by approximately 36%. TGC's financial condition was starkly at odds Courtright's representations to Heartland that it was netting $410,000 per month and growing.

149.     When asked how TGC's decreased advertising revenue would impact the monthly payouts to TGC's investors, TGC's Controller responded that TGC's monthly partner payouts were to be paid with incoming advertising revenue but, if advertising revenue was insufficient to cover the payouts, TGC used incoming money from new investors as a secondary source of payment. According to Heartland, it was "[t]his explanation led HBT to question TGC's business model." TGC's controller thus admitted to Heartland what the financial and account information Heartland possessed and analyzed had shown all along—TGC was operating a Ponzi scheme.

150.     Based on its review of TGC's application to extend the line of credit, Heartland knew that TGC guaranteed a minimum payout to its investors. Heartland has acknowledged that it was also aware of the guarantee because it reviewed a sampling of the contracts that TGC sent to Heartland relating to its account receivables, and by going onto TGC's website and reviewing a related website for Income Store.

151.     On September 10, 2018, before Heartland conveyed its final decision on TGC's application to extend the line of credit, Kentner and Don Funk of Heartland met with Courtright and TGC's CFO to discuss "HBT's concerns in person."

152.     During the September 10, 2018 meeting, Courtright stated that TGC would continue to make monthly partner payouts by using incoming funds from new inventors to cover

the shortfall until either advertising revenue increased or TGC developed an alternative revenue stream.

153.     Only then did Heartland officials, including Don Funk and Heartland, belatedly come "to the agreement that HBT was uncomfortable with the fact that TGC was using funds from new investors to make the guaranteed payouts to existing customers." That is, Heartland was "uncomfortable" with the fact that TGC was operating as a Ponzi scheme and "decided to terminate its banking relationship with TGC."

154.     Heartland informed Courtright of its decision to terminate its relationship with TGC during a September 14, 2018 telephone call.

### PNC Facilitated the Ponzi Scheme Despite Knowledge of Activity Inconsistent with TGC's Stated Business Model

155.     PNC knew that TGC deposited checks from investors representing Upfront Fees under the CPAs into its accounts at the bank. Above and beyond PNC's "know your customer" and customer due diligence obligations, the nature and explicitly stated purpose of the deposits made it clear that the money came from investors as Upfront Fees to purchase websites. The checks and wire transfers showed that the funds were deposited to purchase websites. *See* Exhibit 8.

156.     PNC knew that new investor funds were comingled with loans and that TGC paid guaranteed returns to existing investors from commingled funds. This contradicted what PNC knew to be TGC's stated business model. Commingling of funds is a hallmark of a Ponzi scheme, particularly where that commingling fails to comport with a customer's business purpose. The FFIEC Examination Manual thus identifies as suspicious behavior "[u]nusual transfers of funds [that] occur among related accounts or among accounts that involve the same or related principals."

157.    PNC also knew that TGC's account had been abruptly closed at Heartland—TGC's and Courtright's longstanding bank and that the SEC was investigating TGC, yet PNC continued to facilitate the Ponzi scheme and allow TGC to continue it at PNC.

**Both Heartland and PNC Knew That TGC and Courtright Were Receiving Fiduciary Funds from Their Investors and Were Misusing and Misappropriating Such Funds**

158.    Both Heartland and PNC learned that the money that came into the accounts they held for TGC was investor, fiduciary money, that had been earmarked for a specific purpose—the discretionary purchase and management of websites for investors by TGC and Courtright. The two banks learned of this (1) from their manual processing of investor wires, many of which indicated on their face that the money that was being wired was an "investment" and/or was to be used for the purchase and management of websites; some of these wires came from investment or pension accounts, further demonstrating that the money coming into the Heartland and, later, PNC accounts was investor, fiduciary money; (2) from their discharging of their BSA/AML-related duties that required them to learn about TGC's and Courtright's business and monitor their accounts on an ongoing basis; and (3) in Heartland's case, from its extensive review of TGC and Courtright's business in connection with its extension of credit and financing to them.

159.    Both Heartland and PNC also acquired actual knowledge that Courtright and TGC were misusing fiduciary, earmarked funds they were receiving from investors, and were misappropriating such money. Documents filed in the SEC Action demonstrate that the two banks processed payment requests by Courtright and TGC, from the respective accounts they held for TGC, where they knew investor money was being deposited, with the money being diverted to pay for Courtright's private mortgage and for his children's private school tuition.

**TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION**

160.     Plaintiffs and the proposed class members did not and could not have discovered the facts constituting defendants' violations until after January 15, 2020, when the SEC's civil action against TGC and Courtright was unsealed. *See SEC v. Todays Growth Consultant Inc., et al.*, 19-cv-08454 (N.D. Ill.).

161.     Plaintiffs learned of the actions of TGC, Courtright, Heartland and PNC through the SEC's filings, media coverage, personal interviews, and their independent investigation. Plaintiffs then retained counsel.

162.     Plaintiffs and class members could not reasonably have discovered the facts constituting Defendants' violations until after the law enforcement and regulatory investigations were made public on January 15, 2020. Until then, plaintiffs and class members had only received a notification from TGC that distributions were frozen.

163.     Because plaintiffs and class members could not have reasonably discovered the facts constituting Defendants' violations until after the SEC complaint was filed on December 27, 2019, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

## CLASS ACTION ALLEGATIONS

164.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons or entities who entered into CPAs with TGC from 2013 through December 2019 and were injured as a result.

165.     The class satisfies the requirements of Rule 23(a), as well as 23(b)(1)(B) and 23(b)(3).

166.    **Numerosity**. The members of the class are so numerous that joinder of all members is impracticable. The size of the class, which is estimated to consist of at least 500 individuals and business entities, can only be ascertained through discovery of TGC's records.

167.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the class as all members of the class are similarly affected by Defendants' wrongful conduct.

168.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class action litigation and securities litigation.

169.    **Commonality and Predominance**. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the proposed class. The questions of law and fact common to the class include:

- whether Courtright breached duties to the Plaintiffs and the members of the proposed class;

- whether TGC breached duties to the Plaintiffs and the members of the proposed class;

- whether PNC failed to implement policies, procedures, and training for opening and maintaining customer accounts;

- whether Heartland failed to implement policies, procedures, and training for opening and maintaining customer accounts;

- whether PNC's lack of policies, procedures, and training constituted commercially unreasonable behavior and thus bad faith under the Fiduciary Obligations Act;

- whether Heartland's lack of policies, procedures, and training constituted commercially unreasonable behavior and thus bad faith under the Fiduciary Obligations Act;

- whether PNC was privy to sufficiently obvious facts and circumstances that its passivity made it liable under the Fiduciary Obligations Act and for aiding and abetting breach of fiduciary duty;

- whether Heartland was privy to sufficiently obvious facts and circumstances that its passivity made it liable under the Fiduciary Obligations Act and for aiding and abetting breach of fiduciary duty;

- whether PNC had actual knowledge of Courtright's and TGC's conduct that makes it liable under the Fiduciary Obligations Act and for aiding and abetting breach of fiduciary duty;

- whether Heartland had actual knowledge of Courtright's and TGC's conduct that makes it liable under the Fiduciary Obligations Act and for aiding and abetting breach of fiduciary duty;

- whether PNC ever froze TGC's accounts, investigated the misuse of the account and its funds, or warned TGC's customers about the misuse of the account and its funds;

- whether Heartland ever froze TGC's accounts, investigated the misuse of the account and its funds, or warned TGC's customers about the misuse of the account and its funds;

- whether Heartland owed duties to Plaintiffs and the class, and breached such duties;

- whether PNC owed duties to Plaintiffs and the class, and breached such duties;

- whether PNC's breaches of legal duties proximately caused the losses of Plaintiffs and the class;

- whether Heartland's breaches of legal duties proximately caused the losses of Plaintiffs and the class;

- whether PNC aided and abetted TGC's fraud;

- whether PNC breached its fiduciary duties to Plaintiffs and the class;

- whether Heartland aided and abetted TGC's fraud; and

- whether Heartland breached its fiduciary duties to Plaintiffs and the class.

170.    The class may be certified under Rule 23(b)(1)(B). The prosecution of separate actions by individual investors of TGC would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other customers who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

171.    The class may also be certified under Rule 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members. A class action under Rule 23(b)(3) is also superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

## COUNT I

### Fraud by Omission
### (Against PNC and Heartland)

172.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

173.    PNC and Heartland did not disclose to Plaintiffs or other members of the proposed class all of the facts known to them as set alleged above, including but not limited to the facts that that TGC's business was not sustainable; TGC was paying guaranteed investor payouts with new investors' up-front funds and comingled investor funds and loans; the guaranteed investor payouts far exceeded revenue from websites; the websites generated little or no revenue; and Courtright was transferring funds from TGC's business accounts at to his

personal account for payment of personal expenses such as his mortgage and private school tuition.

174.     PNC and Heartland each had a legal duty to disclose their knowledge of the facts alleged herein.

175.     PNC and Heartland had superior knowledge of the facts. Plaintiffs and other members of the proposed class trust and have confidence in banks like PNC and Heartland to disclose such knowledge. PNC and Heartland are in a position of influence and superiority over Plaintiffs and the other members of the proposed class. PNC and Heartland also had a duty to speak because they helped create the mistaken impression that TGC's investors' money was being held safely in the PNC and Heartland accounts.

176.     PNC and Heartland also had a duty to speak because their silence permitted the Ponzi scheme to continue to the detriment of Plaintiffs and the class.

177.     PNC's and Heartland's knowledge, had it been disclosed, would have been material to Plaintiffs and the other members of the class. The facts known to PNC and Heartland, alleged throughout the complaint, substantially affected the interests of the Plaintiffs and the other members of the class, and the non-disclosure of that knowledge induced Plaintiffs and other members of the proposed class to act, including by mailing or wiring their money to PNC and Heartland and entrusting their money to TGC.

178.     PNC and Heartland knew that Plaintiffs and other members of the class did not share PNC's and Heartland's knowledge of the facts alleged throughout the complaint and knew that Plaintiffs and other members of the class would not have suspected those facts to be true.

179.     PNC and Heartland acted with intent to deceive and an intent to induce action by Plaintiffs and other members of the class because, among other things, the necessary and

foreseeable consequences of their failure to disclose their knowledge was that Plaintiffs and other members of the class would mail or wire their money to PNC and Heartland and entrust their money to TGC. Alternatively, PNC and Heartland acted with reckless disregard for the truth.

180.    Plaintiffs and other members of the class acted in justifiable reliance on PNC's and Heartland's failure to disclose their knowledge when they mailed or wired PNC and Heartland their money and entrusted their money to TGC. Plaintiffs and other members of the class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (i) their lack of access to the facts PNC and Heartland knew; (ii) PNC's and Heartland's concealment of the information; (iii) their inability to detect the fraud; and (iv) the nature of the omitted information. Had PNC and Heartland disclosed their knowledge to Plaintiffs and the other members of the class, they would not have mailed or wired their money to PNC or Heartland or entrusted their money to TGC.

181.    As a direct and proximate result of PNC's and Heartland's failure to disclose their knowledge, Plaintiffs and other members of the class suffered and will continue to suffer damages.

## COUNT II

### Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. § 65/1 et seq.
### (Against PNC and Heartland)

182.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

183.    TGC owed a fiduciary duty to its investors, including Plaintiffs and the other members of the proposed class.

52

184. PNC and Heartland knew that TGC sold unregistered investment contracts, was in possession of investor funds and that TGC owed a fiduciary duty to its investors.

185. TGC deposited checks and wire transfers from investors earmarked for investment and/or for purchase of websites that were made payable to TGC as a fiduciary into accounts that it maintained at PNC and Heartland.

186. TGC breached its fiduciary duty to Plaintiffs and other members of the proposed class. TGC deposited these checks and wire transfers into PNC and Heartland accounts even though it used those funds for an unlawful purpose that was known to PNC and Heartland.

187. PNC and Heartland had actual knowledge of TGC's breaches of fiduciary duty. PNC and Heartland knowingly allowed TGC and Courtright to deposit investors' funds into accounts maintained at PNC and Heartland via wire transfer and check deposit. PNC and Heartland knew, as alleged herein, that TGC's business was not sustainable; TGC was paying investor payouts with new investors' up-front funds and comingled investor funds and loans; the investor payouts far exceeded revenue from websites; the websites generated little or no revenue; and Courtright was transferring funds from TGC's business accounts to his personal account for payment of personal expenses such as his mortgage and private school tuition.

188. PNC and Heartland's knowledge came from (1) their manual processing of a considerable amount of investor wires, many of which disclosed on their face that the money they were sending to TGC's accounts at PNC and Heartland, respectively, was investor, fiduciary money, including in some instances money coming from investment and/or pension accounts; (2) their discharging of their BSA/AML-related duties pertaining to "know your customer" and customer due diligence, both at onboarding and throughout the banking relationship with TGC and Courtright; (3) their numerous interactions with

TGC and Courtright in the course of processing, on a regular basis, of a vast amount of incoming payments from investors and outgoing Ponzi-like payments to earlier investors; and (4) in the case of Heartland, through its extension of vital credit and financing to TGC that enabled the TGC fraud to continue and victimize new investors, and which credit and financing gave Heartland the opportunity to acquire extensive knowledge of TGC's operations, business, and money inflows and outflows.

189.     Alternatively, PNC and Heartland acted in bad faith because they knew of obvious circumstances indicating that TGC was breaching its fiduciary duty to Plaintiffs and other members of the class, but deliberately refrained from informing investors of TGC's activities that breached its fiduciary duties. In doing so, PNC and Heartland acted in a commercially unjustifiable manner because, among other things, they either knew or disregarded and refused to learn facts readily available to them that indicated TGC was breaching its fiduciary duty. PNC and Heartland willfully and dishonestly knew or maintained their ignorance of such readily available facts because they wanted to maintain a lucrative business relationship with a large customer, and they feared that conducting a reasonable inquiry into TGC's and Courtright's highly suspect banking transactions and business conduct or revealing such conduct to investors would lead to loss of business and profits or exposure to liability for TGC's conduct.

190.     Furthermore, PNC and Heartland earned profits from the highly suspect banking transactions and business conduct that they knew or chose to ignore and failed to disclose to investors. It was bad faith for PNC and Heartland to fail to investigate, make reasonable inquiries, or to report their knowledge to TGC's investors.

191.    The actual and foreseeable result of PNC's and Heartland's conduct was the loss of the funds belonging to Plaintiffs and the other members of the class, who have suffered and will continue to suffer damages as a result.

## COUNT III

### Breach of Fiduciary Duty
### (Against Heartland and PNC)

192.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

193.    Heartland and PNC owed a fiduciary duty to Plaintiffs and other members of the proposed class because the deposit of their funds into PNC and Heartland accounts was earmarked for their investments pursuant to the CPAs.

194.    PNC and Heartland were on actual or inquiry notice that a diversion of fiduciary funds by TGC and Courtright would occur or was ongoing.

195.    PNC and Heartland knowingly breached their fiduciary duties to Plaintiffs and other members of the proposed class by, among other things:

    a.    Accepting for deposit funds that were designated only for investment and/or website purchase, and permitting TGC and Courtright to use those funds for other purposes;

    b.    Failing to identify, monitor, or exercise due diligence related to discrepancies and inconsistencies concerning TGC's deposits of Plaintiffs' and other proposed class members' fiduciary funds;

    c.    Failing to implement and adhere to compliance and monitoring protocols concerning TGC's use of Plaintiffs' and proposed class members' funds;

    d.    Failing to identify, monitor, or exercise due diligence related to the "know your customer" and other compliance regulations identified herein;

    e.    Failing to identify, monitor, or exercise due diligence with respect to TGC and Courtright using investor funds for improper purposes;

f.    Failing to prevent or otherwise take action with respect to TGC and Courtright using investor funds for improper purposes;

g.    Failing to notify Plaintiffs and other members of the proposed class of TGC's and Courtright's misappropriation of investor fiduciary funds; and

h.    Causing and allowing investor fiduciary funds to be misappropriated for the use of TGC and Courtright.

196.    As a direct and proximate consequence of the conduct of PNC and Heartland, as alleged in this complaint, Plaintiffs and other members of the proposed class have been damaged thereby at an amount to be determined at trial.

## COUNT IV

### Aiding and Abetting fraud
### (Against PNC and Heartland)

197.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

198.    TGC and Courtright perpetrated a fraud on Plaintiffs and members of the class, as alleged herein by, among other things, omitting and misrepresenting material facts, including but not limited to the facts that that TGC's business was not sustainable; TGC was paying guaranteed investor payouts with new investors' up-front funds and comingled investor funds and loans; the guaranteed investor payouts far exceeded revenue from websites; the websites generated little or no revenue; and Courtright was transferring funds from TGC's business account to his personal account for payment of personal expenses such as his mortgage and private school tuition.

199.    Plaintiffs and the members of the class reasonably relied to their detriment upon TGC's and Courtright's material misrepresentations and omissions when they entered into CPAs with TGC.

200.    PNC and Heartland knowingly and substantially assisted TGC and Courtright in unlawfully defrauding Plaintiffs and the class, as alleged herein, by conducting banking transactions inconsistent with TGC's business model and legitimate business practices.

201.    As stated above, PNC and Heartland's knowledge of TGC and Courtright's fraud and Ponzi payments came from (1) their manual processing of a considerable amount of investor wires, many of which disclosed on their face that the money they were sending to TGC's accounts at PNC and Heartland, respectively, was investor, fiduciary money, including in some instances money coming from investment and/or pension accounts; (2) their discharging of their BSA/AML-related duties pertaining to "know your customer" and customer due diligence, both at onboarding and throughout the banking relationship with TGC and Courtright; (3) their numerous interactions with TGC and Courtright in the course of processing, on a regular basis, of a vast amount of incoming payments from investors and outgoing Ponzi-like payments to earlier investors; (4) their manual processing of a regular and considerable volume of payments to investors, for the investors' supposed distributions, as well as manual processing of a regular and considerable volume of payments for Courtright's personal benefit, including payments for his private residential mortgage; credit card; and private school tuition for his children; and (5) in the case of Heartland, through its extension of vital credit and financing to TGC that enabled the TGC fraud to continue and victimize new investors, and which credit and financing gave Heartland the opportunity to acquire extensive knowledge of TGC's operations, business, and money inflows and outflows.

202. PNC and Heartland's knowing assistance of the TGC fraud was not "merely" substantial; it was crucial to the perpetration of the fraud. PNC and Heartland knowingly participated in and provided substantial assistance to the TGC scheme by, among other things:

- Facilitating the TGC scheme through the deposit of investors' fiduciary funds into the TGC accounts;

- Directing a investors' fiduciary funds for Courtright's personal benefit;

- Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others; and

- In Heartland's case, extending a crucial financial lifeline to Courtright and TGC, designed to provide their fraud with vitally needed funds to avoid collapse and continue to victimize new investors.

203. PNC and Heartland's substantial assistance proximately caused Plaintiffs and the class members to incur substantial losses.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty
### (Against PNC and Heartland)

204. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

205. At all relevant times, Courtright was TGC's Chief Executive Officer and owner of TGC, along with his wife.

206. At all relevant times, Courtright maintained complete or substantially complete control over the TGC. Courtright had complete control, and was the signatory for, the PNC and Heartland bank accounts in which investor funds were deposited.

207. At all relevant times, Courtright and TGC had discretion regarding the development and/or purchase of websites with investor money, and the management of such websites for the benefit of their investors. They advertised their skill and expertise with

58

regard to the selection, purchase, development, maintenance, and monetization of websites, and encouraged investors to entrust them with money to profitably purchase, develop, maintain, and/or monetize such websites.

208.    Courtright and TGC sold unregistered investment contracts to investors, and exclusively and discretionarily managed their investors' money and digital assets, thus becoming their investors' fiduciaries.

209.    By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, Courtright owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith. By entering into CPAs with Plaintiffs and class members and by misappropriating, commingling, and otherwise misusing investor funds, Courtright breached fiduciary duties he owed to Plaintiffs and class members.

210.    As alleged herein, PNC and Heartland substantially assisted in TGC's and Courtright's breaches of fiduciary duty with knowledge that TGC and Courtright were Plaintiffs' and the class members' fiduciaries and were breaching those duties.

211.    PNC's and Heartland's knowledge of TGC's and Courtright's breach of fiduciary duty and misuse and misappropriation of investor funds came from (1) their manual processing of a considerable amount of investor wires, many of which disclosed on their face that the money they were sending to TGC's accounts at PNC and Heartland, respectively, was investor, fiduciary money, including in some instances money coming from investment and/or pension accounts; (2) their discharging of their BSA/AML-related duties pertaining to "know your customer" and customer due diligence, both at onboarding and throughout the banking relationship with TGC and Courtright; (3) their numerous interactions with TGC and Courtright in the course of processing, on a regular basis, of a

vast amount of incoming payments from investors and outgoing Ponzi-like payments to earlier investors; (4) their manual processing of a regular and considerable volume of payments to investors, for the investors' supposed distributions, as well as manual processing of a regular and considerable volume of payments for Courtright's personal benefit, including payments for his private residential mortgage; credit card; and private school tuition for his children; and (5) in the case of Heartland, through its extension of vital credit and financing to TGC that enabled the TGC fraud to continue and victimize new investors, and which credit and financing gave Heartland the opportunity to acquire extensive knowledge of TGC's operations, business, and money inflows and outflows.

212.    Despite such knowledge, Defendants knowingly participated in and provided substantial assistance to Courtright's and TGC's breaches of fiduciary duties by, among other things:

- Facilitating the TGC scheme through the deposit of investor fiduciary funds—including investments specifically coming from pension or investment accounts—into the TGC accounts;

- Directing investors' fiduciary funds for Courtright's personal benefit;

- Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others; and

- In Heartland's case, extending crucial financing to TGC and Courtright, which enabled them to continue to run the fraudulent TGC scheme.

213.    As a direct and proximate result of Defendants' aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT VI

### Negligence
### (Against PNC and Heartland, Pled in the Alternative)

214. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

215. Courtright and TGC deposited investor fiduciary funds from Plaintiffs and class members, many of which clearly indicated they were investments in websites, into PNC and Heartland bank accounts.

216. PNC and Heartland knew that funds raised from TGC investors constituted investor, fiduciary funds earmarked for a specific purpose. PNC and Heartland knew that they were subject to "know your customer" requirements and various common law and regulatory requirements related to opening and monitoring accounts, including regulations issued to prevent Ponzi schemes, money laundering and other fraudulent and illicit behavior.

217. PNC and Heartland knew and/or were on notice that the investor, fiduciary funds they held in their accounts for TGC were being misused and misappropriated, and/or at risk of misuse and misappropriation.

218. PNC and Heartland owed a duty to Plaintiffs and class members to take reasonable care with regard to the maintenance, safeguarding, and use of investor, fiduciary funds on deposit at PNC and Heartland.

219. As set forth more fully above, PNC and Heartland breached this duty of care by, among other things:

- Failing to employ reasonable care in connection with the maintenance and use of TGC investor funds;

- Failing to identify, monitor, or exercise requisite due diligence related to the discrepancies and inconsistencies that characterized Courtright's and TGC's deposits and outlays of investor funds;

- Failing to implement and adhere to compliance and monitoring protocols concerning Courtright's and TGC's maintenance and use of investor funds;

- Failing to identify, monitor, or exercise requisite due diligence related to the compliance regulations detailed herein;

- Failing to prevent or take any appropriate action in response to Courtright's and TGC's use of funds from new investors to pay sums owed to earlier investors;

- Failing to prevent or take any appropriate action in response to Courtright's use of investor funds to pay for personal expenses;

- Causing and allowing investor funds to be misappropriated and misused; and

- Failing to notify investors of Courtright's and TGG's misappropriation and misuse of investor funds.

220.    The breaches described above constitute negligence amounting to bad faith.

221.    PNC's and Heartland's breaches of their duty of care to Plaintiffs and class members caused them reasonably foreseeable harm.

222.    The policy of preventing future harm strongly disfavors application of the economic loss rule, particularly given the moral blame attached to abetting investment fraud. Plaintiffs and class members did not enter into contracts with PNC or Heartland and, thus, seek recovery in tort. There is a high degree of certainty that Plaintiffs and class members suffered injuries, and those injuries were highly foreseeable to PNC and Heartland. The transactions associated with TGC's PNC and Heartland accounts were intended to, and did, directly affect the investors who entered into CPAs.

223.    As a direct and proximate result of PNC's and Heartland's negligence, Plaintiffs and class members have been damaged thereby in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

(a)     certifying the class, appointing Plaintiffs as representatives of the class, and appointing Plaintiffs' counsel as class counsel;

(b)     awarding damages, including pre-judgment interest, on each claim in an amount to be established at trial;

(c)     awarding punitive damages in an amount to be established at trial;

(d)     awarding reasonable attorneys' fees and costs of investigation and litigation; and

(e)     granting such other relief as to this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 12, 2020                              Respectfully submitted,

John S. Burke
HIGGINS & BURKE, P.C.
2560 Foxfield Road, Suite 200
Saint Charles, IL 60174
Tel: (630) 762-9081
Email: jburke@higginsandburke.com

Paul Scarlato (*pro hac vice forthcoming*)
Alan Rosca (*pro hac vice forthcoming*)
GOLDMAN SCARLATO & PENNY, P.C.
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Tel: (484) 342-0700
Email: scarlato@lawgsp.com
          rosca@lawgsp.com

Michael Dell'Angelo (*pro hac vice forthcoming*)
Barbara A. Podell (*pro hac vice forthcoming*)
BERGER MONTAGUE PC

1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net
        bpodell@bm.net