### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PLB INVESTMENTS LLC, JOHN KUEHNER,)
and A.S. PALMER INVESTMENTS LLC,    )
individually and on behalf of all those similarly  )
situated,        )
        )
      Plaintiffs,      )
        )      No. 20 C 1023
    v.        )
        )      Judge Sara L. Ellis
HEARTLAND BANK AND TRUST    )
COMPANY and PNC BANK N.A.,    )
        )
      Defendants.     )

### OPINION AND ORDER

The U.S. Securities and Exchange Commission ("SEC") filed a case against Today's

Growth Consultant Inc. ("TGC"), alleging that TGC and its owner, Kenneth D. Courtright III,

engaged in a Ponzi scheme that defrauded investors. Plaintiffs PLB Investments LLC ("PLB"),

John Kuehner, and A.S. Palmer Investments LLC ("A.S. Palmer"), all TGC investors, filed this

putative class action against two banks with which TGC and Courtright had accounts,

Defendants Heartland Bank and Trust Company ("Heartland") and PNC Bank N.A. ("PNC").

Plaintiffs allege that Heartland and PNC committed fraud, violated their obligations under the

Illinois Fiduciary Obligations Act ("FOA"), 760 Ill. Comp. Stat. 65/1 *et seq.*, breached their

fiduciary duties, aided and abetted TGC and Courtright's fraud and breaches of fiduciary duty,

or, alternatively, acted negligently. Heartland and PNC seek dismissal of the complaint pursuant

to Federal Rule of Civil Procedure 12(b)(6). Because Plaintiffs' allegations do not support an

inference that PNC allowed TGC and Courtright to misappropriate investor funds with actual

knowledge of the misappropriation or in bad faith, the Court dismisses all claims against PNC

without prejudice.  But because Plaintiffs have sufficiently alleged bases to hold Heartland liable

for its actions in facilitating TGC and Courtright's wrongful conduct, Plaintiffs may proceed

against Heartland on their affirmative FOA claim.  Plaintiffs also may proceed against Heartland

with respect to their aiding and abetting claims with respect to Heartland's actions on or after

September 10, 2018, when Heartland learned of the Ponzi scheme.

BACKGROUND[1]

## I.      Overview of TGC's Investment Scheme

TGC, also known as The Income Store, claimed it would provide investors with a

guaranteed rate of return through revenues it generated from websites it built and acquired.

Courtright co-owned TGC with his wife.  He served as the chief executive officer and president

from March 2009 through August 2019, at which time his wife took over as president.

TGC advertised its investment opportunities on websites and radio, touting its expertise

in monetizing websites.  Interested investors then entered into Consulting Performance

Agreements ("CPAs") with TGC.  Since at least 2013, TGC offered and sold approximately 700

CPAs to over 500 investors.  Pursuant to the CPAs, investors paid an upfront fee that TGC

would use "exclusively for the purchase, hosting, maintenance and marketing of the revenue

generating website and the building, hosting, maintenance and marketing of the Authority Site

for the benefit of" the investor.  Doc. 1-2 at 6.  In exchange, TGC guaranteed investors a

minimum rate of return in perpetuity on the revenue TGC generated from those websites.

---

[1] The facts in the background section are taken from Plaintiffs' complaint and exhibits attached thereto and are presumed true for the purpose of resolving Heartland and PNC's motions to dismiss.  *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).  A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment.  *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).  Where a document is referenced in the complaint and central to plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss.  *Id.*  The Court may also take judicial notice of matters of public record.  *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

Typically, the return, paid monthly, was the greater of up to 20% of an investor's initial investment or 50% of the investor's designated website's revenue.

TGC had much success generating investments, raising at least $75 million between January 2017 and October 2019. But its advertised business model proved unsuccessful, with TGC failing to timely purchase and build the promised websites and generate the amount of revenue it had promised to investors. Consequently, to cover the guaranteed returns and remain in business, TGC turned to a Ponzi scheme, paying early investors with money TGC raised from later investors. For example, again between January 2017 and October 2019, TGC paid investors at least $30 million, but because investor websites generated only approximately $9 million in advertising and product sales revenue during that time period, TGC funded the shortfall through new investments. Beginning in May 2019, TGC also used over $12 million in loans from distressed lending companies to help make up the difference.

TGC also spent investor funds on Courtright's personal expenses. Courtright transferred over $1.5 million from TGC's bank accounts to himself or entities he controlled between January 2017 and October 2019. Additionally, Courtright used TGC's bank accounts to pay over $36,851 in personal credit card expenses, as well as over $12,000 in 2018 and over $24,000 in 2019 in tuition expenses to a private secondary school.

Ultimately, on December 13, 2019, TGC informed its investors of a temporary moratorium on payments but indicated its intent to resume payments in April 2020. TGC also offered investors the option to buy back their investments in exchange for an interest-bearing promissory note.

II.     **Investigations into TGC and Courtright**

On December 27, 2019, the SEC filed suit against TGC and Courtright, seeking to

terminate the Ponzi scheme and freeze their assets.  *SEC v. Today's Growth Consultant Inc.*, No.

19 C 8454 (N.D. Ill.).  The court entered an order freezing assets, appointing a receiver, and

staying claims against TGC on December 30, 2019.  The court unsealed the SEC case on January

15, 2020.  In her initial report, the receiver determined that, in 2018 and 2019, TGC received

investments of $41.5 million and had operating expenses of approximately $34.6 million.  The

receiver further reported that, in 2018, TGC had under $2 million in website revenue but made

approximately $12.7 million in payments to investors, with a total loss that year of $5.7 million.

This trend continued in 2019, with TGC website revenue under $4 million, investor payouts of

$16.5 million, and a $7.5 million loss.

In February 2020, the government filed a criminal complaint against Courtright, charging

him with wire fraud.  *United States v. Courtright*, No. 20 CR 77 (N.D. Ill.).  On December 30,

2020, after the filing of this case, the receiver filed a complaint against Heartland and PNC,

alleging violations of the FOA, breach of fiduciary duty, aiding and abetting Courtright's breach

of fiduciary duty, negligence, fraudulent transfer, and unjust enrichment.  *Damian v. Heartland*

*Bank & Tr. Co.*, No. 20 C 7819 (N.D. Ill.).

III.    **TGC's Banking Relationship with Heartland and PNC**

A.      **Relevant Banking Regulations**

Federal banking regulations require banks to have procedures in place that allow them to

"form a reasonable belief that [they] know[ ] the true identity of each customer."  31 C.F.R.

§ 1020.220(a)(2).  Pursuant to federal regulations, banks must also develop customer due

diligence programs to identify suspicious activity, such as repetitive or unusual fund transfer

activity, transactions inconsistent with the account holder's business, transfers among related accounts, large fund transfers in round dollar amounts, and transacting businesses sharing the same address. The Bank Secrecy Act ("BSA"), targeted to prevent money laundering, requires banks to develop and maintain a compliance program that includes internal controls, independent testing, and proper training.

### B. Heartland

TGC had business bank accounts at Heartland, on which Courtright was an authorized signatory. Courtright also had a personal banking relationship with Heartland since 2008. Heartland held mortgages on at least two of Courtright's properties, including his main residence and a condominium in downtown Chicago. Courtright informed Heartland that he operated TGC from his main residence and that TGC paid him monthly rent. Courtright made about 1,400 transfers totaling approximately $5 million out of TGC's business accounts at Heartland for personal reasons, including for fast food, mortgage payments to Heartland, insurance, automotive needs, and marble. This included over $323,000 in transfers from TGC's accounts to the mortgage account at Heartland for Courtright's personal residence between January 2017 and October 2018, with $3,000 transferred each week.

Thomas Kentner served as the Heartland loan officer on all of Heartland's loans to TGC and Courtright from 2015 through October 2018. He reviewed TGC's applications for loans, lines of credit, and extensions. Heartland also had copies of CPAs, as well as TGC's and Courtright's personal financial statements, all of which it reviewed. After speaking with Courtright and other TGC officers to gather additional information, Kentner prepared commercial loan credit memos ("Credit Memos"), which Heartland used to approve or deny TGC's loan requests and establish the terms of the loans.

In March 2015, TGC sought a loan, which Courtright indicated would cover a cash flow deficit created by a delay in the receipt of a wire from one of TGC's customers. Heartland approved the application and extended a thirty-day loan to TGC for $66,886. In June 2015, Heartland approved a $90,000 thirty-day loan to TGC to cover another cash flow deficit. That same month, TGC applied for a $200,000 revolving line of credit to fund its accounts receivable, which Heartland approved in July 2015. In support of the line of credit request, Courtright represented that TGC had a cash flow gap that resulted from the time between when an investor signed a contract, TGC purchased a website, and TGC received the investor's funds and advertising revenues from the website. Heartland renewed TGC's line of credit in July 2016. In April 2017, before TGC's line of credit matured, TGC applied for a $200,000 forty-five-day loan to cover an additional cash flow gap. At that time, TGC had drawn down $180,000 of its existing line of credit and represented that it expected a $522,000 receivable and $3.5 million in product sales at the end of April but needed funds in the interim to pay payroll, payroll taxes, and advertising.

TGC sought to renew its $200,000 line of credit again in August 2017. In response, Heartland requested TGC's current financial statements. Heartland learned from Courtright that because TGC had recently switched accountants for performance-related issues, TGC's new accountants were in the process of updating TGC's 2016 and 2017 financial statements. Because Heartland "was not comfortable" extending TGC's line of credit for a full year without reviewing TGC's updated financials and future business plans, it extended TGC's line of credit for only three months. Doc. 1 ¶ 136. Heartland proceeded to renew the line of credit in three-month increments three more times while TGC updated its financial statements. During this time period, Courtright told Heartland that TGC had restructured the CPAs so that TGC received

6

85%, and not just 50%, of website revenue, and that TGC's website portfolio was generating $410,000 per month and growing $20,000 per month. Courtright also represented to Heartland that TGC now focused primarily on acquiring and maintaining websites that had preexisting advertisement revenue as opposed to building the websites from scratch, claiming the shift in focus helped fuel "exponential growth." *Id.* ¶ 139. A September 22, 2017 Credit Memo reflected Courtright's representations, but the CPAs TGC provided to Heartland for review in September 2017 continued to reflect the 50% revenue split with investors.

On August 7, 2018, TGC's chief financial officer finally provided Heartland with TGC's updated balance sheets and profit and loss statements for 2017 and through July 2018. TGC's 2017 profit and loss statement showed it incurred more than $2 million in losses that year, with website and product revenue totaling less than $3 million and investor payouts totaling over $8 million. The 2018 year-to-date profit and loss statement also showed TGC operating at a loss, with website and product revenue bringing in less than $1 million and investor payouts exceeding $6 million. After reviewing these statements, Heartland's Kentner and Joe Brock spoke with TGC's controller on August 29, 2018. Kentner and Brock expressed concern that TGC's website revenue had decreased significantly while investor payouts had increased, a picture that was at odds with Courtright's representations of TGC's success. In response, TGC's controller acknowledged that TGC used incoming money from new investors to make up any shortfalls in guaranteed investor payouts. Heartland's Kentner and Don Funk then met with Courtright and TGC's chief financial officer on September 10, 2018 to further discuss TGC's financial statements and business model. At that meeting, Courtright acknowledged that TGC had used and would continue to use incoming investor funds to cover the shortfall between website revenues and investor payouts until the website revenues increased or TGC developed an

7

alternative revenue stream. Hearing this, Heartland determined it was "uncomfortable" with TGC's business model and decided to terminate its relationship with TGC. *Id.* ¶ 153. Heartland informed Courtright of this decision in a September 14, 2018 phone call and purportedly closed TGC's accounts by October 23, 2018. Nonetheless, Courtright continued making payments from TGC's accounts at Heartland for personal and business purposes thereafter. Heartland did not report the Ponzi scheme to TGC investors.

### C. PNC

After Heartland indicated it would close TGC's accounts, TGC moved its bank accounts to PNC in September 2018. Courtright was again an authorized signatory on TGC's accounts, and he also opened a personal account at PNC around the same time. PNC knew that Heartland had abruptly closed TGC's accounts at the time TGC opened its PNC accounts. Deposits into TGC's PNC accounts reflected that the deposited funds came from investors to purchase websites. TGC also deposited loan proceeds in its PNC accounts and instructed PNC to use funds from its accounts to make payments to investors and repay loans. At some point, PNC learned that the SEC was investigating TGC. PNC continued to accept deposits from investors, however. It eventually stopped doing so several days before producing TGC's bank records to the SEC in late 2019.

### IV. Plaintiffs' TGC Investments

PLB entered into a CPA with TGC on September 13, 2018, investing $100,000 for a single website by wiring that amount on September 14, 2018 to TGC's accounts at Heartland. Kuehner entered into a CPA and invested $300,000 with TGC in August 2018, wiring that amount to TGC's Heartland accounts. Kuehner also invested $350,000 in 2019, wiring that amount to TGC's accounts at PNC. A.S. Palmer entered into a CPA and invested $100,000 in

May 2017 and an additional $100,000 in February 2018, wiring those amounts to TGC's accounts at Heartland.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

9

## ANALYSIS

### I.     FOA

Heartland and PNC first argue that the FOA provides them with a defense to all of Plaintiffs' claims.[2]  The FOA is "meant to shift the burden of employing honest fiduciaries to the principal instead of the banking institution."  *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill. App. 3d 759, 769 (2007).  In other words, it provides a "total defense to banks for all claims arising from a bank's honest interactions with fiduciaries."  *Crawford Supply Grp., Inc. v. LaSalle Bank, N.A.* (*Crawford Supply I*), No. 09 C 2513, 2010 WL 320299, at *9 (N.D. Ill. Jan. 21, 2010).

Plaintiffs contend that several sections of the FOA apply to their claims, all of which, with slight differences as to the type of transfer at issue, generally protect a bank from liability for the misappropriation of investor funds by a fiduciary unless the bank has actual knowledge of the misappropriation or knowledge of sufficient facts that its actions amount to bad faith.  760 Ill. Comp. Stat. 65/5, 6, 7, 8, 9.  Consequently, a plaintiff generally may state a claim that the FOA allows only if it pleads "(1) that the bank had actual knowledge of the fiduciary's misappropriation of the principal's funds, or (2) that the bank has knowledge of sufficient facts that its actions in paying the funds amount to bad faith."  *Time Savers, Inc.*, 371 Ill. App. 3d at 768.  Plaintiffs need not plead evidentiary facts to avoid the FOA bar, but they must do more

---

[2] In a footnote, PNC also argues that the FOA does not provide Plaintiffs with an affirmative claim, citing the Seventh Circuit's decision in *Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987).  Although one could read language in *Appley* as supporting this argument, some Illinois state and federal court decisions have suggested that, even after *Appley*, the FOA allows for an affirmative claim.  *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.* (*Crawford Supply II*), No. 09 C 2513, 2011 WL 1131292, at *10 (N.D. Ill Mar. 28, 2011) (collecting cases); *Cont'l Cas. Co. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 385 Ill. App. 3d 687, 696–97 (2008) (discussing the trial court's grant of summary judgment on a claim for the violation of FOA § 9).  Because PNC does not meaningfully contest Plaintiffs' ability to pursue an affirmative claim under the FOA and Heartland does not raise the argument at all, to the extent Plaintiffs allege facts to support the banks' liability under the FOA, the Court allows Plaintiffs to affirmatively pursue such a claim.

than merely use "the words 'actual knowledge' and 'bad faith.'" *Id.* Section 7 of the FOA further provides that a bank may be held liable if a fiduciary misuses funds to pay a personal debt to that bank, even absent the bank's actual knowledge of the misconduct or bad faith. 760 Ill. Comp. Stat. 65/7 ("If . . . a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check."). The parties agree that TGC and Courtright misappropriated investor funds, including by making deposits to Courtright's personal accounts at both Heartland and PNC and using funds from TGC's accounts to pay Courtright's personal expenses. Their dispute centers instead on whether Plaintiffs have adequately alleged that (1) Heartland and PNC had actual knowledge of TGC and Courtright's misappropriation of investor funds, (2) Heartland and PNC had knowledge of sufficient facts regarding TGC and Courtright's wrongdoing such that their actions amounted to bad faith, or (3) Courtright breached his fiduciary duty by using investor funds to make payments to Heartland on his personal debt. The Court examines these arguments in turn.

## A.    Actual Knowledge

For purposes of the FOA, "actual knowledge" means "the awareness at the moment of the transaction that the fiduciary is defrauding the principal or having express factual information that funds are being used for private purposes that violate the fiduciary relationship." *Time Savers, Inc.*, 371 Ill. App. 3d at 768 (internal quotation marks omitted) (quoting *Cont'l Cas. Co. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 329 Ill. App. 3d 686, 703 (2002)). What Heartland or PNC should have known from the circumstances does not suffice; Plaintiffs must instead allege facts that give rise to the inference that Heartland and PNC actually knew of TGC and Courtright's

11

misconduct. *Paloian v. F.D.I.C.*, No. 11 C 50017, 2011 WL 5325562, at *7 (N.D. Ill. Nov. 2, 2011).

Plaintiffs allege that Heartland and PNC obtained actual knowledge of TGC's misappropriation of investor funds from (1) manual processing of investor wires, which disclosed on their face that the money was investor, fiduciary money; (2) manual processing of considerable payments for Courtright's personal benefit; (3) discharge of their know your customer, BSA, and due diligence duties; and (4) interactions with TGC and Courtright when processing both incoming and outgoing payments. But these allegations, alone or taken together, do not allow the Court to infer that PNC and Heartland had actual knowledge of the fraud.

Initially, "[m]ere knowledge of the fiduciary relationship is not enough to raise a duty of inquiry on the part of a bank." *Crawford Supply I*, 2010 WL 320299, at *7. Thus, the fact that Heartland and PNC knew that investors wired money into TGC's accounts does not provide a basis for inferring that Heartland and PNC actually knew of TGC's misconduct, particularly where TGC did not use customer-segregated accounts.[3] Although Plaintiffs further contend that TGC's commingling of funds was itself a problem and should have provided Heartland and PNC with notice of TGC's misconduct, the CPAs allowed TGC to use investor funds for a number of purposes so that commingling would not have alone set off red flags.[4] *See Quilling v. Nat'l City Bank of Mich./Ill.*, No. 99 C 50412, 2001 WL 1516732, at *9 (N.D. Ill. Nov. 27, 2001)

---

[3] PNC also argues that PLB and A.S. Palmer cannot rely on PNC's knowledge of investor funds because PLB and A.S. Palmer wired funds to Heartland, not PNC. Because knowledge of a fiduciary relationship generally does not support PNC's actual knowledge, the Court does not consider whether PLB and A.S. Palmer's claims against PNC fail for this additional reason.

[4] With respect to PNC, the complaint does not allege that PNC ever reviewed a CPA, meaning that PNC could not be charged with any knowledge of the permitted uses of investor funds. Although Plaintiffs do claim that they have alleged that PNC reviewed CPAs in their response to the motions to dismiss, the paragraphs they cite from the complaint do not support that assertion. But, as noted above, even taking this additional allegation from the response brief into account would not change the Court's analysis of whether PNC had actual knowledge of TGC and Courtright's misconduct.

12

(agreement did not provide bank with knowledge about how funds were to be used because the agreement was "about as clear as mud," "confusing and convoluted," and "would not have made it obvious to National City that Benson was breaching his fiduciary duties by withdrawing funds from the account in violation of the agreement").

Further, Plaintiffs do not point to any duty the banks had to track every expenditure of the funds in TGC's accounts, and the FOA does not impose a duty on banks to "cross-referenc[e] the accounts of all those who had dealings with the bank and acted as fiduciaries with their personal incomes and other assets." *Crawford Supply II*, 2011 WL 1131292, at *8. Therefore, that Courtright made many transfers from TGC's accounts to his own personal accounts "does not, without more, give rise to the inference that a bank had actual knowledge of wrongdoing or bad faith," particularly because "there are many legitimate reasons why a fiduciary might frequently move large sums of money on behalf of a principal." *Crawford Supply I*, 2010 WL 320299, at *7 (collecting cases); *see also Beedie v. Associated Bank Ill., N.A.*, No. 10-cv-1351, 2011 WL 2460959, at *4 (C.D. Ill. June 21, 2011) (allegation that the fiduciary moved large sums of money from fiduciary account to his personal account did not provide a basis to infer that the bank had knowledge of the fiduciary's misconduct); *Setera v. Nat'l City Bank*, No. 07 C 2978, 2008 WL 4425446, at *3 (N.D. Ill. Sept. 26, 2008) ("The most the bank could be charged with is knowledge that Jines was making frequent withdrawals from the MPI account. This level of knowledge, however, does not amount to 'express factual information' that the funds were being used for Jines's private purposes[.]"); *Johnson v. Citizens Nat'l Bank of Decatur*, 30 Ill. App. 3d 1066, 1072 (1975) ("[T]here are many legitimate reasons why an agent and principal might engage in odd checking practices.").

Next, Plaintiffs allege that, in discharging their duties under federal regulations to know their customers and engage in due diligence to detect money laundering, Heartland and PNC should have discovered the fraud.  But the fact that Heartland and PNC discharged their regulatory duties does not show actual knowledge but only that they had procedures in place that could have uncovered misconduct.  *See Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (know your customer obligations could only support an inference of what a bank should have known, not what the bank actually knew); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 923–24 (W.D. Mich. 2010) (collecting cases rejecting arguments that a bank's anti-money laundering obligations support a finding of actual knowledge of fraud because such arguments "do nothing to prove actual knowledge, but assert only what the Bank should have known had it fulfilled its duties of investigation"), *aff'd*, 712 F.3d 917 (6th Cir. 2013).  Again, the question is not what Heartland and PNC should have known, but what they did in fact know.

Finally, aside from the specific interactions discussed below with respect to Heartland, Plaintiffs only make conclusory allegations about the banks' interactions with TGC and Courtright when processing payments.  The Court cannot infer that the banks gained any specific knowledge about misconduct from these unspecified interactions.  *See Time Savers, Inc.*, 371 Ill. App. 3d at 770 (allegation that a bank had actual knowledge of fraud based on conversations with fiduciary did not suffice to show actual knowledge where the complaint did not include any details related to those conversations).

Although this means that Plaintiffs have not alleged that PNC had actual knowledge of TGC and Courtright's misconduct, the Court must also consider whether Heartland's extension of credit and financing to TGC and its review of TGC's operations, business, and finances in

connection with the financing demonstrates Heartland's actual knowledge. Plaintiffs' more general allegations about Heartland's possession and review of these documents suffer from the same flaws discussed already because they focus only on what Heartland should have known, not on what Heartland actually knew. *See Crawford Supply I*, 2010 WL 320299, at *7 ("What LaSalle 'should have known' is not what matters, however. What matters under the Fiduciary Obligations Act is what LaSalle actually knew."). But Plaintiffs sufficiently allege that Heartland eventually attained actual knowledge of the misconduct by September 10, 2018, when TGC's controller and Courtright admitted to Heartland that TGC was using incoming money from new investors to make up the shortfalls in guaranteed investor payouts. Although Heartland claimed to terminate its relationship with TGC and Courtright shortly after learning of the Ponzi scheme, Plaintiffs allege that Courtright continued to make improper transfers from TGC's Heartland accounts well into 2019. Therefore, Plaintiffs can pursue their claims against Heartland with respect to misconduct occurring on or after September 10, 2018 based on Heartland's actual knowledge of such misconduct.

### B. Bad Faith

This does not end the inquiry, however, because Plaintiffs can alternatively avoid the FOA bar by alleging that PNC and Heartland had knowledge of sufficient facts regarding TGC and Courtright's wrongdoing that the banks' actions amounted to bad faith. Illinois courts have defined "bad faith" for FOA purposes to include situations "where the bank 'suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that [it] may avoid knowledge that the fiduciary is acting improperly.'" *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 50 (2005) (alteration in original) (quoting *Cnty. of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 436 (1995)); *see also Time Savers, Inc.*, 371 Ill. App. 3d at 768 ("In

determining whether a bank has acted in bad faith, courts will consider whether it was commercially unjustifiable for the payee to disregard and refuse to learn readily available facts such that it was bad faith to remain passive."). But a bank's negligence is not enough to meet the bad faith standard. *Beedie v. Associated Bank Ill., N.A.*, No. 10-cv-1351, 2012 WL 13005591, at *6 (C.D. Ill. Aug. 30, 2012). Plaintiffs rely on essentially the same allegations of the banks' knowledge to alternatively argue that Heartland and PNC acted in bad faith. The Court addresses these allegations as they relate to each bank separately.

First, with respect to PNC, the complaint does not suggest that PNC had any motive not to investigate TGC or Courtright's actions. Unlike Heartland, the complaint alleges that PNC had only a depositor relationship with TGC and Courtright. Plaintiffs do not allege that PNC gave TGC or Courtright preferential treatment, accepted payments to service Courtright's personal debt, or otherwise had any specific insight into Courtright's personal finances. *See Paloian*, 2011 WL 5325562, at *8 (allegations did not support bad faith where, among other things, the plaintiff did not allege that the bank had any knowledge of the fiduciaries' "personal finances or any reason to believe they were living a lifestyle unsupported by their legitimate income"); *Crawford Supply I*, 2010 WL 320299, at *9 (no basis for an inference of bad faith where, among other things, the bank did not give the fiduciary "preferential treatment or assistance," the bank did not accept payments from the fiduciary to service his personal debt, and the bank did not have any "special insight into [the fiduciary's] income or his personal finances"). Further, TGC and Courtright's misconduct was not obvious, particularly given the fact that TGC had ordinary and not customer segregated accounts with PNC. *Cf. In re Peregrine Fin. Grp. Customer Litig.*, No. 12 C 5546, 2014 WL 4784113, at *7 (N.D. Ill. Sept. 25, 2014) (a bank's knowledge of a customer segregated account from which it would be unlikely to have a

16

large number of transfers to non-principal accounts suggested the bank's bad faith). And "[m]ere suspicious circumstances," like the fact that TGC deposited funds from distressed company lenders into its account or opened accounts with PNC after having a longstanding relationship with Heartland, "are not enough to require the Bank to inquire."[5] *Johnson*, 30 Ill. App. 3d at 1072. Plaintiffs also contend that PNC should have investigated further because it knew that TGC had insufficient income to justify its withdrawals, but Plaintiffs do not point to any specific allegations that PNC actually reviewed TGC's financial statements, closely monitored TGC's accounts, or did anything else to obtain this knowledge.

PNC's continuation of the banking relationship with TGC after learning of the SEC's investigation into TGC comes closer to supporting a finding of bad faith. But the SEC has broad power to investigate potential past, ongoing, or future violations of the securities laws. 15 U.S.C. § 77t(a); *Kokesh v. S.E.C.*, --- U.S. ----, 137 S. Ct. 1635, 1640 (2017). Without additional details as to what PNC knew about the SEC investigation and how long it knew of that investigation before shutting down TGC's accounts, Plaintiffs have not plausibly alleged that PNC acted in bad faith by failing to further investigate upon receiving notice of the SEC's investigation. Because Plaintiffs' allegations do not give rise to an inference of bad faith by PNC, the FOA bars them from proceeding on any claim against PNC.

The analysis is different for Heartland, however, given Heartland's more extensive relationship with TGC and Courtright and its review of TGC and Courtright's financial documents. Plaintiffs allege that Heartland became uncomfortable with extending additional funding to TGC in 2017 and asked for additional documentation as a result. Yet, despite this

---

[5] Plaintiffs claim in their response that PNC's due diligence should have revealed the reason why Heartland terminated its banking relationship with TGC and Courtright. But, as PNC points out, because Plaintiffs only allege that PNC had a depositor relationship with TGC and Courtright, the allegations do not plausibly suggest that PNC had reason to consider why Heartland terminated its relationship with PNC.

discomfort, Heartland continued to prop TGC up with short-term financing for over a year while waiting for TGC to provide revised financial statements instead of conducting an active investigation of its own. Citing *Quilling*, Heartland argues that its actions are the opposite of bad faith because it identified concerns and ultimately terminated its relationship with TGC and Courtright. *See Quilling*, 2001 WL 1516732, at *9 (no bad faith where bank started investigating "[a]s soon as the slightest suspicion arose," even though "it took nine months and another letter . . . before [the bank] shut the account down"). But *Quilling* was decided at the summary judgment stage, and Plaintiffs' allegations here at least suggest that Heartland only took cursory steps to investigate while at the same time ignoring signs of wrongdoing. For example, Plaintiffs allege that Heartland relied on Courtright's representations about TGC's business and changes it was making to address cash flow concerns while ignoring evidence in the CPAs and financial statements that directly undermined Courtright's representations. This at least calls into question whether Heartland's actions in requesting additional documentation and providing only short-term loans negate a finding of bad faith.

Additionally, Plaintiffs' allegations suggest that Heartland had a financial motive to avoid digging deeper into TGC and Courtright's actions. Because Heartland had made loans directly to Courtright, Plaintiffs allege that a more fulsome investigation could have jeopardized the potential for repayment. *See Crawford Supply II*, 2011 WL 1131292, at *6 (bank chose "to ignore [fiduciary's] breaches rather than lose his business"); *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *1, *4 (N.D. Ill. Sept. 5, 1996) (plaintiff sufficiently alleged bad faith where, among other things, bank executives socialized with the fiduciary, who was the township supervisor, and the bank had a strong financial interest in keeping the township's accounts with the bank). Combined with the fact that Courtright had transferred TGC funds into

18

his own account at Heartland and used funds from TGC's accounts to pay his mortgage with Heartland, the complaint includes allegations of more than just suspicious circumstances or negligence. *See Falk v. N. Trust Co.*, 327 Ill. App. 3d 101, 103–04, 111–12 (2001) (the plaintiff sufficiently alleged a bank's bad faith by alleging that the fiduciary had transferred the principal's funds into her own account, the fiduciary used funds to pay a personal loan owed to the bank, and the bank had reviewed the fiduciary's tax returns and other financial statements and knew she had insufficient income to support her account and loan activity); *Crawford Supply I*, 2010 WL 320299, at *8 ("The fact that the bank accepted checks drawn on the principal's account in payment of the fiduciary's personal debts owed to the bank was critical to the [*Falk*] court's finding [of bad faith] in that case"). Taken together, Plaintiffs' allegations against Heartland give rise to an inference of bad faith, allowing them to more generally pursue their claims against Heartland under the FOA. *See Ohio Cas. Ins. Co.*, 1996 WL 507292, at *4 ("While probably none of the matters alleged, standing alone, would be sufficient to demonstrate bad faith, their totality raises enough of an inference of bad faith for pleading purposes.").

### C. Section 7

In response to Heartland's motion to dismiss, Plaintiffs also argue that they may proceed against Heartland under § 7 of the FOA regardless of whether the complaint sufficiently alleges Heartland's actual knowledge or bad faith. Section 7 of the FOA provides that a drawee bank is liable where a fiduciary makes a payment to the bank for a personal debt and breaches his fiduciary duty in doing so. 760 Ill. Comp. Stat. 65/7; *Mikrut*, 359 Ill. App. 3d at 49 ("Section 7, however, also provides that a drawee bank is liable if a fiduciary delivers a check made payable to it 'in payment of or as security for a personal debt,' and 'if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.' Under this latter

provision, plaintiffs must show that [the fiduciary] drew checks on the client escrow account in payment of or as security for a personal debt [the fiduciary] owed to [the bank]." (quoting 760 Ill. Comp. Stat. 65/7)).  Plaintiffs argue that because Courtright used funds from TGC's accounts to pay his outstanding personal loan balances to Heartland, they need not show that Heartland had actual knowledge or acted in bad faith to proceed against it.  Heartland argues that § 7 does not apply because Plaintiffs have not alleged that the specific funds they deposited in TGC's accounts at Heartland were among those used to pay Courtright's personal debt to Heartland. But this asks too much of Plaintiffs at the pleading stage.  All Plaintiffs allege that they wired funds to TGC's accounts before Courtright made at least some of the payments to Heartland on his personal debt from TGC's accounts and that TGC commingled funds in its accounts, making tracing next to impossible.  Therefore, at this stage, the Court finds that § 7 provides Plaintiffs with another basis to hold Heartland liable under the FOA.  And because the Court has found that the FOA does not bar Plaintiffs' claims against Heartland, it proceeds to address whether Plaintiffs have sufficiently alleged their common law claims against Heartland.

## II.    Aiding and Abetting Claims

To state an aiding and abetting claim, Plaintiffs must allege that (1) TGC or Courtright performed a wrongful act that caused injury, (2) Heartland was aware of their role when they provided assistance, and (3) Heartland knowingly and substantially assisted the violation.  *Time Savers, Inc.*, 371 Ill. App. 3d at 772.  Although Rule 9(b) applies to the circumstances surrounding the alleged fraud involved, Plaintiffs may allege Heartland's knowledge generally. *Heffernan v. Bass*, 467 F.3d 596, 601–02 (7th Cir. 2006); *Prestwick Cap. Mgmt. Ltd. v. Peregrine Fin. Grp., Inc.*, No. 10 C 23, 2010 WL 4684038, at *4 (N.D. Ill. Nov. 12, 2010).

Heartland does not dispute that Plaintiffs have sufficiently alleged that TGC and Courtright perpetrated a fraud or breached their fiduciary duties. Instead, they challenge the second and third elements, arguing that Plaintiffs have not alleged Heartland's actual knowledge or substantial assistance. The Court has already addressed the actual knowledge question above, finding that Plaintiffs have only alleged Heartland's actual knowledge of TGC and Courtright's misconduct on or after September 10, 2018. And allegations of bad faith or what the banks should have known do not suffice for purposes of an aiding and abetting claim. *See Zachman v. Citibank, N.A.*, 183 F. Supp. 3d 922, 924 (N.D. Ill. 2016) (failure to allege bank's actual knowledge of scheme was fatal to aiding and abetting claim); *In re Canopy Fin., Inc.*, No. 12-cv-04646, 2015 WL 3505010, at *7 (N.D. Ill. June 2, 2015) ("[A]nalysis of claims of aiding and abetting fraud and breach of fiduciary duty has consistently distinguished actual knowledge and participation from the 'should have known' state of mind, and has just as consistently held that the latter mindset is not actionable."); *Johnson v. Filler*, 2018 IL App (2d) 170923, ¶¶ 20–23 (complaint failed to meet knowledge requirement of an aiding and abetting claim where it implied that the defendant "did not know of any undue influence but would have found out if he had investigated").

Further, to the extent that Plaintiffs could assert Heartland's actual knowledge of TGC and Courtright's fraud before September 10, 2018, the complaint does not allow for the inference that Heartland substantially assisted this fraud. Plaintiffs allege that Heartland provided substantial assistance by processing the deposit of investors' funds into TGC's accounts and allowing investors' funds to be used for Courtright's personal benefit. Plaintiffs also claim that Heartland extended TGC and Courtright a financial lifeline that allowed the scheme to continue. But these allegations do not rise to the required level of substantial assistance and instead

21

demonstrate only that Heartland provided TGC and Courtright with routine banking services. *See Bane v. Sigmundr Expl. Corp.*, 848 F.2d 579, 582 (5th Cir. 1988) ("[R]outine extension of a loan does not amount to substantial assistance."); *Heinert v. Bank of Am., N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019) (routine banking services, "even where they are performed with 'atypical' frequency," do not support finding of substantial assistance), *aff'd*, --- F. App'x ----, 2020 WL 6689287 (2d Cir. 2020); *In re TelexFree Sec. Litig.*, 357 F. Supp. 3d 70, 76 (D. Mass. 2019) (provision of banking services, including effecting transfers and making payments, does not actively or substantially assist a fraud). Because Plaintiffs have not sufficiently alleged that Heartland actually knew that pre-September 10, 2018 transactions assisted TGC and Courtright in committing fraud and breaching their fiduciary duties, such extension of financing cannot amount to substantial assistance, even if it allowed TGC and Courtright to continue their scheme longer than they otherwise would have been able. *See El Camino*, 722 F. Supp. 2d at 911 ("Ordinary business transactions that a bank performs for its customer can satisfy the substantial assistance element of an aiding-and-abetting claim only if the bank 'actually knew that those transactions were assisting the customer in committing a specific tort.'" (citation omitted))[6]; *cf. Cagan v. W. Suburban Bank*, No. 90 C 5582, 1992 WL 80966, at *1–2, 6 (N.D. Ill. Apr. 15, 1992) (bank's actions constituted substantial assistance where, in addition to facilitating investments, it "remain[ed] silent despite its knowledge of the sham nature of these investments" and so arguably "fostered the entire scheme and kept the house of cards from collapsing longer than it otherwise might have").

---

[6] Plaintiffs cited only a portion of this quotation from *El Camino* to support their argument that Heartland and PNC's undertaking of "ordinary business transactions" could support the substantial assistance element. Doc. 34 at 32. In doing so, they mischaracterized the court's analysis in *El Camino* by omitting the qualification that ordinary transactions only satisfy the substantial assistance element if the bank knew the transactions assisted its customer in committing misconduct. *El Camino*, 722 F. Supp. 2d at 911.

As for whether Heartland provided substantial assistance on or after September 10, 2018, Plaintiffs allege that even though Heartland took steps to end its relationship with TGC and Courtright, transfers continued between TGC and Courtright's accounts. They also allege that Heartland did not report its knowledge of the Ponzi scheme to investors, allowing TGC and Courtright to continue the scheme at another bank and still pay down Courtright's obligations to Heartland with investor funds. These allegations at least allow for an inference that Heartland provided TGC and Courtright with substantial assistance in perpetuating their fraud and breaching their fiduciary duties on or after September 10, 2018. *See Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 29 (2003) (allegations that the defendant actively concealed information sufficed to suggest substantial assistance). Therefore, Plaintiffs may proceed on their aiding and abetting claims related to Heartland's actions on or after September 10, 2018.

## III.  Claims Depending on the Existence of a Legal Duty

To state claims for negligence, fraud by omission, and breach of fiduciary duty, Plaintiffs must allege, respectively, that Heartland owed them a duty of care, a duty to speak, or a fiduciary duty. *See Setera*, 2008 WL 4425446, at *4 ("A claim for negligence requires that the defendant breach a duty of care owed to the plaintiff."); *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087 (2010) (claim for fraud by omission requires a special or fiduciary relationship that gives rise to a duty to speak); *Paloian*, 2011 WL 5325562, at *4 (plaintiff must allege existence of fiduciary relationship in order to state claim for breach of fiduciary duty).

Initially, Illinois does not recognize a common law duty of care extending from Heartland to Plaintiffs because banks do not owe a duty of care to non-customers. *See Setera*, 2008 WL 4425446, at *4 (collecting cases); *Thompson v. Capital One Bank, Inc.*, 375 F. Supp. 2d 681, 683–84 (N.D. Ill. 2005). As for the other two claims, which depend on the existence of a

fiduciary or special relationship, a bank generally does not owe a fiduciary duty to its depositors, let alone to its non-customers. *See Geimer v. Bank of Am., N.A.*, 784 F. Supp. 2d 926, 932 (N.D. Ill. 2011) (the relationship between a bank and a depositor is "no more than 'an arms-length transaction between debtor and creditor'" (quoting *Miller v. Am. Nat'l Bank & Tr. Co.*, 4 F.3d 518, 520 (7th Cir. 1993))). A fiduciary relationship may arise, however, where a plaintiff places trust and confidence in the defendant so that the defendant attains a position of influence and superiority over the plaintiff. *Kurtz v. Solomon*, 275 Ill. App. 3d 643, 651 (1995). Here, Plaintiffs have provided only conclusory allegations that they placed trust and confidence in Heartland, generically alleging that they "trust and have confidence in banks like PNC and Heartland," Doc. 1 ¶ 175, with no factual allegations to support this conclusion. And Plaintiffs do not even allege that Heartland held a position of influence and superiority over Plaintiffs. *See Paloian*, 2011 WL 5325562, at *4 ("In the absence of dominance and influence, there is no fiduciary relationship between the parties, no matter what the level of trust [the depositor] placed in [the bank].").

Plaintiffs respond that their negligence, fraud by omission, and breach of fiduciary duty claims may proceed because the FOA establishes duties that Heartland owed to TGC's investors. Indeed, a statute may create a duty. *See Bd. of Educ. of Indian Prairie Sch. Dist. No. 204 v. Du Page Cnty. Election Comm'n*, 341 Ill. App. 3d 327, 331 (2003) (collecting cases). But here, in enacting the FOA, Illinois "expressed the intent to preempt other state law and to establish a total defense to banks for all claims arising from a bank's honest interactions with fiduciaries." *Crawford Supply I*, 2010 WL 320299, at *9. It does not appear that the Illinois legislature intended to create additional duties actionable in the common law, with the FOA instead "purposely narrow[ing] common law liability, which held a third-party liable if it 'assisted a

fiduciary in misappropriating a principal's funds' regardless of whether that third-party had knowledge of the misappropriation." *Willmott v. Fed. Street Advisors, Inc.*, No. 05 C 1124, 2006 WL 3743716, at *4 (N.D. Ill. Dec. 19, 2006) (quoting *Appley*, 832 F.2d at 1030–31). Because Heartland does not challenge Plaintiffs' ability to pursue an affirmative claim under the FOA based on the alleged breach of the statutory requirements, the Court fails to see how common law claims of negligence, fraud by omission, or breach of fiduciary duty based on the FOA would afford Plaintiffs any non-duplicative relief. *Cf. Crawford Supply II*, 2011 WL 1131292, at *11 (dismissing affirmative FOA claim as duplicative of plaintiffs' bad faith negligence and breach of contract claims). Therefore, because Plaintiffs have not alleged any extra-statutory duty and any potential statutory duties duplicate Plaintiffs' affirmative FOA claim, the Court finds it appropriate to streamline the case and focus on whether Plaintiffs can demonstrate Heartland committed an affirmative violation of the FOA.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Heartland's motion to dismiss [27] and grants PNC's motions to dismiss [30]. The Court dismisses all of Plaintiffs' claims against PNC without prejudice. The Court dismisses Plaintiffs' claims for fraud by omission (Count I), breach of fiduciary duty (Count III), aiding and abetting fraud and breach of fiduciary duty with respect to actions that occurred before September 10, 2018 (Counts IV and V), and negligence (Count VI) against Heartland without prejudice.


Dated: February 9, 2021

_____
SARA L. ELLIS
United States District Judge

25