**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PLB INVESTMENTS LLC, JOHN KUEHNER, )
A.S. PALMER INVESTMENTS LLC, and )
VISION 8110, LLC, individually and on behalf )
of all those similarly situated, )
                                            )
              Plaintiffs, )
                                            )        No. 20 C 1023
      v. )
                                            )        Judge Sara L. Ellis
HEARTLAND BANK AND TRUST )
COMPANY and PNC BANK N.A., )
                                            )
              Defendants. )

## OPINION AND ORDER

The U.S. Securities and Exchange Commission ("SEC") filed a case against Today's Growth Consultant Inc. ("TGC"), alleging that TGC and its owner, Kenneth D. Courtright III, engaged in a Ponzi scheme that defrauded investors. Subsequently, Plaintiffs PLB Investments LLC ("PLB"), John Kuehner, and A.S. Palmer Investments LLC ("A.S. Palmer"), all TGC investors, filed a putative class action against two banks with which TGC and Courtright had accounts, Defendants Heartland Bank and Trust Company ("Heartland") and PNC Bank N.A. ("PNC"). In their initial complaint, Plaintiffs alleged that Heartland and PNC committed fraud, violated their obligations under the Illinois Fiduciary Obligations Act ("FOA"), 760 Ill. Comp. Stat. 65/1 *et seq.*, breached their fiduciary duties, aided and abetted TGC and Courtright's fraud and breaches of fiduciary duty, or, alternatively, acted negligently. In ruling on Heartland and PNC's motions to dismiss, Doc. 51, the Court found that Plaintiffs had not sufficiently alleged that PNC allowed TGC and Courtright to misappropriate investor funds with actual knowledge of the misappropriation or in bad faith, warranting dismissal of all claims against PNC without

prejudice. But the Court allowed Plaintiffs to proceed against Heartland on their affirmative FOA claim and their aiding and abetting claims with respect to Heartland's actions on or after September 10, 2018, the point at which the allegations supported the inference that Heartland learned of the Ponzi scheme.

Plaintiffs have since filed an amended complaint, adding Vision 8110, LLC ("Vision") as a named Plaintiff, including additional allegations against PNC in an attempt to show actual knowledge or bad faith, and narrowing its claims to only an affirmative violation of the FOA and aiding and abetting TGC and Courtright's fraud, in Heartland's case after September 10, 2018 and in PNC's case after April 5, 2019. Both Heartland and PNC have filed motions to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because Plaintiffs' additional allegations do not cure the deficiencies the Court previously identified with respect to their claims against PNC, the Court dismisses all claims against PNC with prejudice. The Court also does not find Heartland's new arguments for outright dismissal persuasive, although it agrees that Vision does not have an affirmative FOA claim against Heartland and that Kuehner's affirmative FOA claim is limited to the investment he made in 2018 by wiring funds to TGC's account at Heartland.

# BACKGROUND[1]

## I.      Overview of TGC's Investment Scheme

TGC, also known as The Income Store, claimed it would provide investors with a guaranteed rate of return through revenues it generated from websites it built and acquired. Courtright co-owned TGC with his wife. He served as TGC's chief executive officer and president from March 2009 through August 2019, at which time his wife took over as president.

TGC advertised its investment opportunities on websites and radio, touting its expertise in monetizing websites. Interested investors then entered into Consulting Performance Agreements ("CPAs") with TGC. Since at least 2013, TGC offered and sold approximately 700 CPAs to over 500 investors. Pursuant to the CPAs, investors paid an upfront fee that TGC would use "exclusively" for the purchase, hosting, maintenance, and marketing of the investors' websites. Doc. 108 ¶ 84. In exchange, TGC guaranteed investors a minimum rate of return in perpetuity on the revenue TGC generated from those websites. Typically, the return, paid monthly, was the greater of up to 20% of an investor's initial investment or 50% of the investor's designated website's revenue.

TGC had much success generating investments, raising at least $75 million between January 2017 and October 2019. But its advertised business model proved unsuccessful, with TGC failing to timely purchase and build the promised websites and generate the amount of revenue promised to investors. Consequently, to cover the guaranteed returns and remain in

---

[1] The Court takes the facts in the background section from Plaintiffs' amended complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Heartland and PNC's motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). Where a document is referenced in the amended complaint and central to plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.* The Court may also take judicial notice of matters of public record. *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

business, TGC turned to a Ponzi scheme, paying early investors with money TGC raised from later investors. For example, again between January 2017 and October 2019, TGC paid investors at least $30 million, but because investor websites generated only approximately $9 million in advertising and product sales revenue during that time period, TGC funded the shortfall through new investments. Beginning in May 2019, TGC also used over $12 million in loans from distressed lending companies to help make up the difference.

TGC also spent investor funds on Courtright's personal expenses. Courtright transferred over $1.5 million from TGC's bank accounts to himself or entities he controlled between January 2017 and October 2019. Additionally, Courtright used TGC's bank accounts to pay over $36,851 in personal credit card expenses, as well as over $12,000 in 2018 and over $24,000 in 2019 in tuition expenses to a private secondary school.

Ultimately, on December 13, 2019, TGC informed its investors of a temporary moratorium on payments but indicated its intent to resume payments in April 2020. TGC also offered investors the option to buy back their investments in exchange for an interest-bearing promissory note.

## II.     Investigations into TGC and Courtright

On December 27, 2019, the SEC filed suit against TGC and Courtright, seeking to terminate the Ponzi scheme and freeze their assets. *SEC v. Today's Growth Consultant Inc.* (the "SEC Action"), No. 19 C 8454 (N.D. Ill.). The court entered an order freezing assets, appointing a Receiver, and staying claims against TGC on December 30, 2019. The court unsealed the SEC case on January 15, 2020. In her initial report, the Receiver determined that, in 2018 and 2019, TGC received investments of $41.5 million and had operating expenses of approximately $34.6 million. The Receiver further reported that, in 2018, TGC had under $2 million in website

4

revenue but made approximately $12.7 million in payments to investors, with a total loss that year of $5.7 million. This trend continued in 2019, with TGC website revenue under $4 million, investor payouts of $16.5 million, and a $7.5 million loss.

In February 2020, the government filed a criminal complaint against Courtright, charging him with wire fraud. *United States v. Courtright*, No. 20 CR 77 (N.D. Ill.). On December 30, 2020, after the filing of this case, the Receiver filed a complaint against Heartland and PNC, alleging violations of the FOA, breach of fiduciary duty, aiding and abetting Courtright's breach of fiduciary duty, negligence, fraudulent transfer, and unjust enrichment. *Damian v. Heartland Bank & Tr. Co.* (the "Receiver Action"), No. 20 C 7819 (N.D. Ill.). The Receiver's action is also pending before this Court.

### III. TGC's Banking Relationship with Heartland and PNC

#### A. Relevant Banking Regulations

Federal banking regulations require banks to have procedures in place that allow them to "form a reasonable belief that [they] know[ ] the true identity of each customer." 31 C.F.R. § 1020.220(a)(2). Pursuant to federal regulations, banks must also develop customer due diligence programs to identify suspicious activity, such as repetitive or unusual fund transfer activity, transactions inconsistent with the account holder's business, transfers among related accounts, large fund transfers in round dollar amounts, and transacting businesses sharing the same address. The Bank Secrecy Act ("BSA"), targeted to prevent money laundering, requires banks to develop and maintain a compliance program that includes internal controls, independent testing, and proper training.

### B. Heartland

TGC had business bank accounts at Heartland, for which Courtright was an authorized signatory. Courtright also had a personal banking relationship with Heartland since 2008. Heartland held mortgages on at least two of Courtright's properties, including his main residence and a condominium in downtown Chicago. Courtright informed Heartland that he operated TGC from his main residence and that TGC paid him monthly rent. Courtright made about 1,400 transfers totaling approximately $5 million out of TGC's business accounts at Heartland for personal reasons, including for fast food, mortgage payments to Heartland, insurance, automotive needs, and marble. This included over $323,000 in transfers from TGC's accounts to the mortgage account at Heartland for Courtright's personal residence between January 2017 and October 2018, with $3,000 transferred each week.

Thomas Kentner served as the Heartland loan officer on all of Heartland's loans to TGC and Courtright from 2015 through October 2018. He reviewed TGC's applications for loans, lines of credit, and extensions. Heartland also had copies of CPAs, as well as TGC's and Courtright's personal financial statements, all of which it reviewed. After speaking with Courtright and other TGC officers to gather additional information, Kentner prepared commercial loan credit memos ("Credit Memos"), which Heartland used to approve or deny TGC's loan requests and establish the terms of the loans.

In March 2015, TGC sought a loan, which Courtright indicated would cover a cash flow deficit created by a delay in the receipt of a wire from one of TGC's customers. Heartland approved the application and extended a thirty-day loan to TGC for $66,886. In June 2015, Heartland approved a $90,000 thirty-day loan to TGC to cover another cash flow deficit. That same month, TGC applied for a $200,000 revolving line of credit to fund its accounts receivable,

which Heartland approved in July 2015. In support of the line of credit request, Courtright represented that TGC had a cash flow gap that resulted from the time between when an investor signed a contract, TGC purchased a website, and TGC received the investor's funds and advertising revenues from the website. Heartland renewed TGC's line of credit in July 2016. In April 2017, before TGC's line of credit matured, TGC applied for a $200,000 forty-five-day loan to cover an additional cash flow gap. At that time, TGC had drawn down $180,000 of its existing line of credit. TGC represented that it expected a $522,000 receivable and $3.5 million in product sales at the end of April but needed funds in the interim to pay payroll, payroll taxes, and advertising.

TGC sought to renew its $200,000 line of credit again in August 2017. In response, Heartland requested TGC's current financial statements. Heartland learned from Courtright that because TGC had recently switched accountants for performance-related issues, TGC's new accountants were in the process of updating TGC's 2016 and 2017 financial statements. Because Heartland "was not comfortable" extending TGC's line of credit for a full year without reviewing TGC's updated financials and future business plans, it extended TGC's line of credit for only three months. Doc. 108 ¶ 153. Heartland proceeded to renew the line of credit in three-month increments three more times while TGC updated its financial statements. During this time period, Courtright told Heartland that TGC had restructured the CPAs so that TGC received 85%, and not just 50%, of website revenue, and that TGC's website portfolio was generating $410,000 per month and growing $20,000 per month. Courtright also represented to Heartland that TGC now focused primarily on acquiring and maintaining websites that had preexisting advertisement revenue as opposed to building the websites from scratch, claiming the shift in focus helped fuel "exponential growth." *Id.* ¶ 156. A September 22, 2017 Credit Memo

reflected Courtright's representations, but the CPAs TGC provided to Heartland for review in September 2017 continued to reflect the 50% revenue split with investors.

On August 7, 2018, TGC's chief financial officer finally provided Heartland with TGC's updated balance sheets and profit and loss statements for 2017 and through July 2018. TGC's 2017 profit and loss statement showed it incurred more than $2 million in losses that year, with website and product revenue totaling less than $3 million and investor payouts totaling over $8 million. The 2018 year-to-date profit and loss statement also showed TGC operating at a loss, with website and product revenue bringing in less than $1 million and investor payouts exceeding $6 million. After reviewing these statements, Heartland's Kentner and Joe Brock spoke with TGC's controller on August 29, 2018. Kentner and Brock expressed concern that TGC's website revenue had decreased significantly while investor payouts had increased, a picture at odds with Courtright's representations of TGC's success. In response, TGC's controller acknowledged that TGC used incoming money from new investors to make up any shortfalls in guaranteed investor payouts. Heartland's Kentner and Don Funk then met with Courtright and TGC's chief financial officer on September 10, 2018 to further discuss TGC's financial statements and business model. At that meeting, Courtright acknowledged that TGC had used and would continue to use incoming investor funds to cover the shortfall between website revenues and investor payouts until the website revenues increased or TGC developed an alternative revenue stream. Hearing this, Heartland determined it was "uncomfortable" with TGC's business model and decided to terminate its relationship with TGC. *Id.* ¶ 170. Heartland informed Courtright of this decision in a September 14, 2018 phone call and purportedly closed TGC's accounts by October 23, 2018. Nonetheless, Courtright continued making payments from

8

TGC's accounts at Heartland for personal and business purposes thereafter. Heartland did not report the Ponzi scheme to TGC investors.

### C.    PNC

After Heartland indicated it would close TGC's accounts, TGC moved its bank accounts to PNC in September 2018. Courtright was again an authorized signatory on TGC's accounts, and he also opened a personal account at PNC around the same time. Deposits into TGC's PNC accounts reflected that the deposited funds came from investors to purchase websites. TGC also deposited almost $12 million in loan proceeds in its PNC accounts and instructed PNC to use funds from its accounts to make payments to investors and repay loans. From its review of TGC's accounts, financial statements, and business records, PNC learned that the Courtrights used TGC funds for their own personal purposes.

On September 19, 2018, two PNC representatives visited TGC's Lancaster, Pennsylvania office and met with TGC employees, including its controller and treasurer. PNC obtained information about TGC's business and accounts during this visit. Additionally, on September 26, 2018, Michael Postupak, a PNC senior vice president and the relationship manager for TGC, learned that Kerri Courtright wanted her personal bank account at PNC to automatically draw $2,500 from TGC's operating account any time her personal account balance dropped to $1,500.

PNC conducted a monthly "corporate account analysis" of TGC's account, charging TGC monthly fees that totaled $31,252.73 between November 2018 and December 2019 for this service. The corporate account analysis involved determining if TGC's "non-interest bearing, collected, demand deposit balances for the month (net of balances required to support account

activity) are sufficient, as determined solely by [PNC], to offset that month's fees."[2]  Doc. 116-3 at 6.

In response to TGC requests, PNC increased TGC's ACH exposure limits on four separate occasions.[3]  Specifically, on October 22, 2018, PNC approved TGC's application for a $1.5 million increase in ACH exposure, followed by an additional $50,000 extension on November 2, 2018.  Later in 2019, PNC granted another credit extension application, increasing TGC's ACH exposure limit to $2.1 million.  In considering TGC's requests for the ACH exposure extensions, PNC reviewed TGC's income tax returns, financial statements, credit score information, purported business model, and marketing materials.  PNC's credit approval memoranda reflect PNC's understanding that TGC entered into partnerships with investors to purchase and build websites, with TGC splitting profits with the investors.  The memoranda noted TGC's sources of repayment all came from cash flow from operations, although the financial statements demonstrated that the income from the website operations did not suffice to cover investor payouts and other costs.  PNC highlighted its profitable relationship with TGC as a reason for approving the extension requests, listing as strengths its existing relationship with TGC as well as TGC's financial position.  It also noted TGC's poor "quality of financial reporting," as well as TGC's poor origination scores, as potential weaknesses.  Doc. 108 ¶ 184.

---

[2] The amended complaint asserts that the corporate account analysis involved "continuous and in-depth account review and analysis services," including reviewing TGC financials, business models, and marketing materials, from which PNC learned that TGC's revenue could not cover investor distributions and that instead TGC was running a Ponzi scheme.  Doc. 108 ¶¶ 78, 185.  PNC's account agreement with TGC, however, contradicts Plaintiffs' allegations that the corporate account analysis involved such an extensive account review.  Doc. 116-3 at 6.

[3] As set forth in PNC's account agreement with TGC, TGC's ACH limit was "the maximum dollar amount of accumulated ACH Credit Entries for which [PNC] ha[s] not received final payment from [TGC] and which, subject to these terms and conditions, [PNC] will process for [TGC]."  *Id.* at 43.  TGC also agreed "to have on deposit in the Account(s) on the Settlement Date sufficient available funds to cover the total amount of [its] Credit Entries."  *Id.* at 42.

The memoranda did note, however, that the quality of TGC's financial reporting was "[a]cceptable for this level of ACH exposure." Doc. 116-5 at 8. Ultimately, when balancing TGC's strengths and weaknesses, PNC determined that the strengths mitigated the weaknesses.

On April 5, 2019, the SEC issued a subpoena to PNC requesting TGC documents pursuant to an SEC formal order of investigation.[4] PNC received this subpoena on April 8, 2019. The SEC issued four additional subpoenas to PNC related to TGC on April 11 (received by PNC on May 9), August 19 (received by PNC on August 21), November 1 (received by PNC on November 5), and December 3, 2019 (received by PNC on December 4). Despite receipt of these subpoenas, PNC continued to accept deposits from investors, taking in over $16.5 million in investor deposits between April 5 and October 31, 2019 and an additional $1.8 million in November 2019. At least one of the ACH extensions to TGC occurred after PNC learned of the SEC's investigation. PNC eventually stopped accepting investor deposits to the TGC account in December 2019.

## IV. Plaintiffs' TGC Investments

PLB entered into a CPA with TGC on September 13, 2018, investing $100,000 for a single website by wiring that amount on September 14, 2018 to TGC's accounts at Heartland. Kuehner entered into a CPA and invested $300,000 with TGC in August 2018, wiring that amount to TGC's Heartland accounts. Kuehner also invested $350,000 in 2019, wiring that amount to TGC's accounts at PNC. A.S. Palmer entered into a CPA and invested $100,000 in May 2017 and an additional $100,000 in February 2018, wiring those amounts to TGC's accounts at Heartland. Vision entered into a CPA with TGC and invested $100,000 in October 2019, with that amount wired to TGC's accounts at PNC.

---

[4] The SEC's enforcement manual provides that subpoenaed parties may request access to the formal order of investigation.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).  To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case."  *AnchorBank*, 649 F.3d at 615 (citation omitted).  Rule 9(b) applies to "all averments of fraud, not claims of fraud."  *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).  "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements."  *Id.*

12

## ANALYSIS

### I.     PNC's Motion to Dismiss

#### A.     FOA

In addressing Plaintiffs' initial complaint, the Court dismissed all claims against PNC, finding that Plaintiffs had not sufficiently alleged that PNC allowed TGC and Courtright to misappropriate investor funds with actual knowledge of the misappropriation or in bad faith. Plaintiffs have since repleaded their claims against PNC, adding additional allegations in an attempt to address these deficiencies. Nonetheless, PNC again argues that the amended complaint fails to allege its actual knowledge of the misappropriation of investor funds or its bad faith in failing to discover the misappropriation.

As the Court previously noted, the FOA "shift[s] the burden of employing honest fiduciaries to the principal instead of the banking institution." *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill. App. 3d 759, 769 (2007). In other words, it provides a "total defense to banks for all claims arising from a bank's honest interactions with fiduciaries." *Crawford Supply Grp., Inc. v. LaSalle Bank, N.A.* (*Crawford Supply I*), No. 09 C 2513, 2010 WL 320299, at *9 (N.D. Ill. Jan. 21, 2010). An exception exists, however, if a plaintiff pleads "(1) that the bank had actual knowledge of the fiduciary's misappropriation of the principal's funds, or (2) that the bank had knowledge of sufficient facts that its actions in paying the funds amount to bad faith." *Time Savers, Inc.*, 371 Ill. App. 3d at 768. Plaintiffs need not plead evidentiary facts to avoid the FOA bar, but they must do more than merely use "the words 'actual knowledge' and 'bad faith.'" *Id.* Although the parties agree that TGC and Courtright misappropriated investor funds, PNC argues that the additional facts Plaintiffs have added to their amended complaint do not suffice to show its actual knowledge or bad faith.

### 1.    Actual Knowledge

For purposes of the FOA, "actual knowledge" means "the awareness at the moment of the transaction that the fiduciary is defrauding the principal or having express factual information that funds are being used for private purposes that violate the fiduciary relationship." *Id.* (internal quotation marks omitted) (quoting *Cont'l Cas. Co. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 329 Ill. App. 3d 686, 703 (2002)).  What PNC should have known from the circumstances does not suffice; Plaintiffs must instead allege facts that give rise to the inference that PNC actually knew of TGC and Courtright's misconduct. *Paloian v. F.D.I.C.*, No. 11 C 50017, 2011 WL 5325562, at *7 (N.D. Ill. Nov. 2, 2011).

In their initial complaint, Plaintiffs alleged that PNC obtained actual knowledge of TGC's misappropriation of investor funds from: (1) manual processing of investor wires, which disclosed on their face that the money was investor, fiduciary money; (2) manual processing of considerable payments for Courtright's personal benefit; (3) discharge of PNC's know your customer, BSA, and due diligence duties; and (4) interactions with TGC and Courtright when processing both incoming and outgoing payments.  As the Court previously found, these allegations, alone or taken together, do not allow the inference that PNC had actual knowledge of the fraud.[5]  Doc. 51 at 11–14.  In their amended complaint, Plaintiffs include several additional allegations that they contend show actual knowledge: (1) PNC's receipt of SEC subpoenas; (2) TGC's abrupt departure from Heartland to PNC; (3) Kerri Courtright's request of an automatic transfer from TGC's account to her personal account when the personal account balance dropped below $1,500; (4) the corporate account analysis fee PNC charged TGC; (5) the

---

[5] Although the amended complaint continues to include these allegations, the Court does not address them in detail here, instead incorporating and adopting its analysis from its February 9, 2021 Opinion and Order on the issue.  *See* Doc. 51 at 11–14.  The Court instead only addresses the new allegations Plaintiffs have included against PNC in the amended complaint.

ACH extensions and PNC's related reviews of TGC's financial statements and business model; and (6) TGC's receipt of loans from distressed lenders that it commingled with investor money.

Plaintiffs mainly focus on PNC's receipt of the SEC subpoenas, arguing that these alone establish PNC's actual knowledge. According to Plaintiffs, the SEC only opens an investigation if the facts sufficiently suggest fraud or a securities violation, meaning that a bank's receipt of a subpoena requesting documents about a customer automatically provides the bank with actual knowledge of fraud or a related violation. But this goes too far, improperly piling inference upon inference. Aside from alleging the dates of the subpoenas, Plaintiffs only allege that PNC could have requested a copy of the SEC's formal order of investigation into TGC. But what PNC could have known if it had requested that formal order of investigation does not matter for purposes of alleging actual knowledge. *See Crawford Supply I*, 2010 WL 320299, at *7 ("What LaSalle 'should have known' is not what matters, however. What matters under the Fiduciary Obligations Act is what LaSalle actually knew."). And here, Plaintiffs have not plausibly alleged that the subpoenas themselves provided PNC with actual knowledge of TGC's misappropriation. Instead, as PNC argues, because the SEC has broad powers to investigate potential past, ongoing, or future violations of the securities laws, *see* 15 U.S.C. § 77t(a); *Kokesh v. S.E.C.*, --- U.S. ----, 137 S. Ct. 1635, 1640 (2017), subpoenas for documents suggest only that the SEC has begun an investigation into *whether* a violation has occurred, and does not, as Plaintiffs argue, demonstrate that a violation has actually occurred, *see* SEC Enforcement Manual § 2.3.4, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. Even Plaintiffs admit this in their response to PNC's motion to dismiss, arguing that the subpoenas did not give PNC actual knowledge of fraud but rather that they gave "PNC actual knowledge that the facts in the SEC's possession at that time, learned through the SEC's careful investigation and analysis, 'suggest a

possible violation of the federal securities laws involving fraud or other serious misconduct.'"

Doc. 129 at 17 (quoting SEC Enforcement Manual § 2.3.3). But a *possible* violation of federal

securities laws cannot satisfy the FOA's actual knowledge standard. *See Time Savers, Inc.*, 371

Ill. App. 3d at 768 (actual knowledge requires "the awareness at the moment of the transaction

that the fiduciary is defrauding the principal or having express factual information that funds are

being used for private purposes that violate the fiduciary relationship"). Therefore, the amended

complaint does not allow for the inference that PNC's receipt of the SEC subpoenas

automatically provided it with actual knowledge of TGC and Courtright's misconduct. *See*

*Praither v. Northbrook Bank & Tr. Co.*, 2021 IL App (1st) 201192, ¶ 39 ("If banks could be held

liable based on mere inference or suspicious circumstances, they would be obligated to inquire

into a fiduciary's transactions to ensure nothing was amiss. Requiring banks to investigate every

such transaction would run afoul of the Act's purpose, which is 'to facilitate banking and

financial transactions.'" (citation omitted)).

Next, Plaintiffs contend that TGC's abrupt departure from Heartland to PNC, and PNC's

meeting with TGC in September 2018, suggests PNC's actual knowledge of the fraud. But the

amended complaint does not include any basis to infer that PNC learned of the reasons for

TGC's departure from Heartland during that meeting or at any other time, negating any inference

of actual knowledge with respect to this allegation. *See Time Savers, Inc.*, 371 Ill. App. 3d at

770 (allegation that a bank had actual knowledge of fraud based on conversations with fiduciary

did not suffice to show actual knowledge where the complaint did not include any details related

to those conversations). Similarly, the corporate account analysis fee does not suggest that PNC

had actual knowledge of any wrongdoing. While Plaintiffs contend that PNC engaged in an in-

depth account analysis every month, PNC's agreement spelling out the purpose of the corporate

account analysis fee belies this argument, instead revealing that the monthly review involved determining only whether TGC's balances sufficed to offset the monthly fees PNC charged to TGC.

As for Kerri Courtright's request for an automatic transfer, as PNC points out, Plaintiffs do not allege that PNC actually complied with Kerri Courtright's request. And even if it did, such a request does not suggest actual knowledge because "there are many legitimate reasons why a fiduciary might frequently move large sums of money on behalf of a principal." *Crawford Supply I*, 2010 WL 320299, at *7 (collecting cases); *see also Beedie v. Associated Bank Ill., N.A.*, No. 10-cv-1351, 2011 WL 2460959, at *4 (C.D. Ill. June 21, 2011) (allegation that the fiduciary moved large sums of money from fiduciary account to his personal account did not provide a basis to infer that the bank had knowledge of the fiduciary's misconduct); *Setera v. Nat'l City Bank*, No. 07 C 2978, 2008 WL 4425446, at *3 (N.D. Ill. Sept. 26, 2008) ("The most the bank could be charged with is knowledge that Jines was making frequent withdrawals from the MPI account. This level of knowledge, however, does not amount to 'express factual information' that the funds were being used for Jines's private purposes[.]"); *Johnson v. Citizens Nat'l Bank of Decatur*, 30 Ill. App. 3d 1066, 1072 (1975) ("[T]here are many legitimate reasons why an agent and principal might engage in odd checking practices.").

With respect to the ACH extensions and PNC's evaluation of TGC's finances and business model in connection with these extensions, Plaintiffs' allegations again improperly focus on what PNC should have known, not on what it actually did know. *See Praither*, 2021 IL App (1st) 201192, ¶ 38 ("While they may have alleged suspicious circumstances from which one might infer knowledge, evidence of actual knowledge 'cannot be based on circumstances that give rise only to conjecture and suspicion.'" (quoting *People v. Hinton*, 402 Ill. App. 3d 181, 185

(2010))). Finally, the Court has already rejected the argument that the commingling of funds could support PNC's actual knowledge. Doc. 51 at 12. Although PNC knew that investors wired money into TGC's accounts, "[m]ere knowledge of the fiduciary relationship is not enough to raise a duty of inquiry on the part of a bank." *Crawford Supply I*, 2010 WL 320299, at *7. Because TGC did not use customer-segregated accounts, the commingling of loan proceeds with investor funds would not have provided PNC with actual knowledge of any misappropriation. Even when taken together, Plaintiffs' additional allegations concerning PNC only raise questions as to what PNC should have known instead of plausibly suggesting that PNC did know of TGC and Courtright's misappropriation of investor funds, which does not suffice to proceed against PNC under the FOA's actual knowledge exception.

### B. Bad Faith

This does not end the inquiry, however, because Plaintiffs can alternatively avoid the FOA bar by alleging that PNC had knowledge of sufficient facts regarding TGC and Courtright's wrongdoing that its actions amounted to bad faith. Illinois courts have defined "bad faith" for FOA purposes to include situations "where the bank 'suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that [it] may avoid knowledge that the fiduciary is acting improperly.'" *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 50 (2005) (alteration in original) (quoting *Cnty. of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 436 (1995)); *see also Time Savers, Inc.*, 371 Ill. App. 3d at 768 ("In determining whether a bank has acted in bad faith, courts will consider whether it was commercially unjustifiable for the payee to disregard and refuse to learn readily available facts such that it was bad faith to remain passive."). But a bank's negligence does not meet the bad faith standard. *Beedie v. Associated Bank Ill., N.A.*, No. 10-cv-1351, 2012 WL 13005591, at *6 (C.D. Ill. Aug. 30, 2012).

Plaintiffs rely on the same allegations of PNC's knowledge to alternatively argue that PNC acted in bad faith. As with actual knowledge, these allegations do not provide a basis for inferring that PNC acted in bad faith. Initially, nothing in the amended complaint suggests that PNC had a motive not to investigate TGC or Courtright's actions. Unlike Heartland, PNC had only a depositor relationship with TGC and Courtright. Although Plaintiffs argue that PNC gave TGC preferential treatment by increasing TGC's ACH exposure limits, these extensions did not amount to a loan or otherwise provide TGC with a "financial lifeline." *See Crawford Supply I*, 2010 WL 320299, at *9 (no basis for an inference of bad faith where, among other things, the bank did not give the fiduciary "preferential treatment or assistance," the bank did not accept payments from the fiduciary to service his personal debt, and the bank did not have any "special insight into [the fiduciary's] income or his personal finances"); *cf. Crawford Supply Grp., Inc. v. Bank of Am., N.A.* (*Crawford Supply II*), No. 09 C 2513, 2011 WL 1131292, at *6 (N.D. Ill. Mar. 28, 2011) (bank chose "to ignore [fiduciary's] breaches rather than lose his business"). Nor did the ACH extensions require further investigation by PNC given that these requests were "outwardly proper" and not "*per se* alarming," as PNC documented in the credit approval memoranda. *Praither*, 2021 IL App (1st) 201192, ¶ 40 (citations omitted). Further, TGC and Courtright's misconduct was not obvious, particularly given the fact that TGC had ordinary and not customer-segregated accounts with PNC. *Cf. In re Peregrine Fin. Grp. Customer Litig.*, No. 12 C 5546, 2014 WL 4784113, at *7 (N.D. Ill. Sept. 25, 2014) (a bank's knowledge of a customer-segregated account from which it would be unlikely to have a large number of transfers to non-principal accounts suggested the bank's bad faith). And "[m]ere suspicious circumstances," like the fact that TGC deposited funds from distressed company lenders into its

account or opened accounts with PNC after having a longstanding relationship with Heartland, "are not enough to require the Bank to inquire." *Johnson*, 30 Ill. App. 3d at 1072.

The Court previously noted that PNC's continuation of the banking relationship with TGC after learning of the SEC's investigation into TGC came closer to supporting a finding of bad faith but indicated the complaint lacked sufficient details as to what PNC knew about the investigation and for how long before it stopped accepting investor deposits. Doc. 51 at 17. Although Plaintiffs have added the dates of the SEC subpoenas, nothing about these dates or the existence of the subpoenas themselves suggests that PNC acted in bad faith by failing to further investigate upon receiving notice of the SEC's investigation. *See Paloian*, 2011 WL 5325562, at *7 ("[T]he facts plaintiff alleges do not indicate 'obvious circumstances' that became so 'cogent' that Amcore acted in bad faith in failing to further investigate them." (quoting *Appley v. West*, 832 F.3d 1021, 1031 (7th Cir. 1987))); *cf. Beedie*, 2012 WL 13005591, at *6 (discussing the "egregious conduct" required of banks to find they acted in bad faith). And even had PNC requested the formal order of investigation, nothing in the amended complaint or the SEC enforcement manual suggests that review of the formal order would have required additional action on PNC's part, particularly given the necessity of a formal order for the SEC to subpoena bank records. SEC Enforcement Manual 3.2.6. Nor, as discussed above, does the amended complaint indicate that PNC deliberately avoided learning of TGC and Courtright's wrongdoing. *See Time Savers, Inc.*, 371 Ill. App. 3d at 770 (bank did not act in bad faith where the plaintiff "did not allege any facts that indicate [the bank] *deliberately* failed to inquire further even if the transactions were suspicious").

Therefore, because Plaintiffs' allegations do not give rise to an inference of bad faith by PNC, the FOA bars them from proceeding on any claim against PNC.[6] And because Plaintiffs have failed to address the deficiencies previously identified by the Court, despite having ample opportunity to do so, and further amendment would be futile, the Court dismisses Plaintiffs' claims against PNC with prejudice. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 734–35 (7th Cir. 2014) (affirming dismissal with prejudice of first amended complaint after initial complaint was dismissed without prejudice); *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Tr. v. Walgreen Co.*, No. 09 C 2046, 2010 WL 624709, at *1 (N.D. Ill. Feb. 18, 2010) (dismissing amended complaint with prejudice after previous dismissal of ICFA and unjust enrichment claims without prejudice), *aff'd*, 631 F.3d 436 (7th Cir. 2011).

## II. Heartland's Motion to Dismiss

The Court previously found that Plaintiffs could proceed against Heartland on their affirmative FOA claim and their aiding and abetting claims with respect to Heartland's actions on or after September 10, 2018, the point at which one can infer that Heartland learned of the Ponzi scheme. In the amended complaint, Plaintiffs did not add additional allegations as to Heartland in an attempt to avoid Heartland filing another motion to dismiss. Doc. 108 at 61 n.11. Nonetheless, Heartland seeks dismissal of the amended complaint, not based on the sufficiency of the allegations but rather for prudential reasons concerning the proper administration of the Receivership Estate in the SEC Action. Specifically, Heartland argues that (1) Plaintiffs' claims usurp the Receiver's exclusive authority to recover on behalf of TGC's creditors and disrupt the claims process in the SEC Action; (2) Plaintiffs improperly seek a double recovery by pursuing this action; and (3) Plaintiffs' claims duplicate those brought by the

---

[6] Because the Court finds that the FOA bars all claims against PNC, the Court need not address PNC's additional arguments for dismissal.

21

Receiver in the Receiver Action, creating a risk of inconsistent rulings and wasting judicial resources.[7] Heartland separately argues that, if the Court allows the claims in this case to proceed against it, the Court should nonetheless dismiss Vision and Kuehner's claims because Heartland never held any of their funds. The Court addresses these arguments in turn.

### A.  Usurpation of the Receiver's Exclusive Authority

First, Heartland argues that the court in the SEC Action granted the Receiver exclusive authority over the claims Plaintiffs bring in this lawsuit, meaning that this case cannot continue and Plaintiffs instead must seek recovery through the claims process established in the SEC Action. In the order appointing the Receiver in the SEC Action (the "Receivership Order"), the court froze all of TGC's assets and "restrained and enjoined" all those with direct or indirect control over those assets "from directly or indirectly transferring, settling off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing" the assets. SEC Action, Doc. 19 ¶ 3. The court ordered the receiver to, among other things, "pursue and preserve all claims or interests" of TGC, *id.* ¶ 6; "sue for and collect, recover, receive, and take into possession from third parties all Receivership Assets," *id.* ¶ 8(C); "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver," *id.* ¶ 8(J); and "pursue, resist and defend all suits, actions, claims, and demands which may now be pending or which may be

---

[7] The Court agrees with Plaintiffs that Heartland could have and should have raised at least the first two arguments in their initial motion to dismiss Plaintiffs' complaint, particularly given that Plaintiffs' amended complaint only adds additional allegations against PNC. *See Burton v. Ghosh*, 961 F.3d 960, 968 (7th Cir. 2020) ("[T]he invitation to answer an amended complaint should be understood as permission to plead in response to the amendments, as contemplated by Rule 15(a)(3), unless leave is expressly given to raise new defenses unrelated to the amendments. In the usual course, this means responding to the new substance of the amended complaint."); Wright & Miller, 5C Federal Practice & Procedure § 1388 ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading."). Nonetheless, the Court finds it appropriate to address Heartland's arguments on their merits given that the parties have fully briefed the issues.

brought by or asserted against the Receivership Estates," *id.* ¶ 8(K). The court also enjoined any persons receiving notice of the Receivership Order from "directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver," that would "[i]nterfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets" or "[d]issipate or otherwise diminish the value of any Receivership Assets." *Id.* ¶ 30. The Receivership Order also stayed all litigation involving TGC, the Receiver, and "any Receivership property, wherever located," absent an order of court. *Id.* ¶¶ 32, 34.

In connection with the SEC Action, the Receiver established a claims process and distribution plan, which the court approved on November 30, 2020. SEC Action, Doc. 109. As set forth in the notice sent to investors and creditors, investors who had CPAs with TGC and incurred a net loss of the principal amount they paid to TGC could participate in the claims process by filing a proof of claim by January 14, 2021. SEC Action, Doc. 112-1. An investor with an allowed claim could obtain either turnover of the website assigned to the investor or a monetary distribution based on their net loss of the principal they paid to TGC.[8]

Heartland argues that Plaintiffs have ignored the Receivership Order and that all claims of TGC's investors, including those raised here, belong in the SEC Action. But this is not the appropriate place or time to raise this argument. Instead, all such arguments concerning alleged violations of the Receivership Order belong before the court that entered that order. Heartland, however, has not sought any ruling regarding Plaintiffs' alleged violation of the Receivership Order from the court presiding over the SEC Action. Further, the Receivership Order gives the Receiver, not third parties such as Heartland, the power to enforce the Receivership Order. *See* SEC Action, Doc. 19 ¶ 32 ("The Receiver shall promptly notify the Court and the SEC counsel

---

[8] The parties have not indicated whether Plaintiffs filed claims in the SEC Action.

of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.").  And the Receiver has made no objection to the pendency of this litigation and instead has tacitly approved its continuation, seeking reassignment of the Receiver Action as related to this case.  Doc. 60.  Therefore, the Court does not find that the Receivership Order provides a proper basis for the dismissal of Plaintiffs' claims absent further guidance from the court presiding over the SEC Action.[9]

### B.      Double Recovery

Next, Heartland argues that by pursuing their claims in this case while also having the potential to recover through the Receivership, Plaintiffs improperly seek a double recovery.  *See Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 422 (2002) ("It is well established that for one injury there should only be one recovery irrespective of the availability of multiple remedies and actions.").  Even assuming that Plaintiffs and the Receiver seek essentially the same damages from Heartland, the possibility that Plaintiffs may obtain a double recovery if this case proceeds alongside the Receiver Action remains entirely hypothetical and does not provide a ground for dismissal at the pleading stage.  And as Plaintiffs point out, if this case proceeds to the damages stage, various mechanisms exist to ensure that Plaintiffs do not obtain a double recovery.

### C.      Judicial Economy and the Risk of Inconsistent Rulings

Finally, Heartland argues that this case duplicates claims brought by the Receiver in the Receiver Action and so, to conserve resources and avoid the risk of inconsistent rulings, the Court should dismiss this case while allowing the claims of the Receiver to proceed. Admittedly, this case and the Receiver Action both raise claims against Heartland related to

---

[9] The Court's refusal to dismiss this case on the basis of interference with the Receivership does not preclude the court presiding over the SEC Action from making a different determination.

violation of the FOA and aiding and abetting Courtright's misconduct, with the allegations against Heartland essentially the same in both cases. Heartland argues that both cases will require substantially the same discovery and involve the same issues of fact and law, suggesting that only allowing one case to proceed would further judicial economy and prevent the risk of disparate rulings. But Heartland ignores that this Court is presiding over both cases and has indicated that the cases will proceed on the same track. This minimizes concerns about judicial economy and inconsistent rulings, and the parties and the Court can work together to ensure that these cases proceed together as efficiently as possible. Ultimately, Heartland has not identified a valid basis for dismissing this action based on the existence of the Receivership or the Receiver Action, and so the Court will allow Plaintiffs to proceed with their claims against Heartland at this time.

### D. Vision and Kuehner's Claims against Heartland

Because the Court does not find Heartland's other arguments require dismissal, it must address the argument that Vision and Kuehner do not have claims against Heartland for the amounts they transferred to TGC's accounts at PNC, not Heartland. The amended complaint indicates that Vision invested $100,000 in TGC by wiring that amount to TGC's account at PNC in October 2019. Although Kuehner did wire his initial August 2018 investment to TGC's account at Heartland, he also invested an additional $350,000 by wiring funds to TGC's account at PNC in 2019. Heartland argues that the FOA requires Plaintiffs to "identify specific transactions where Plaintiffs' funds were misappropriated." *Aguilar v. PNC Bank, N.A.*, No. 14-CV-985, 2015 WL 13375792, at *15 (E.D. Mo. Oct. 20, 2015) (considering Missouri's codification of the Uniform Fiduciaries Act), *aff'd*, 853 F.3d 390 (8th Cir. 2017). The Court will not require exact identification at the pleading stage, however, particularly given its prior

25

conclusion that TGC's commingling of funds in its accounts makes tracing difficult. Doc. 51 at 20. But the Court agrees with Heartland that, with respect to the affirmative FOA claim, Vision has no claim against Heartland because Heartland never held any of Vision's funds, and Kuehner cannot recover against Heartland with respect to his $350,000 2019 investment, as he wired those funds to PNC, not Heartland. That said, because the aiding and abetting claims could extend to actions TGC and Courtright took with respect to money wired to PNC's accounts, the Court will at this stage allow Vision to proceed against Heartland on those claims. Kuehner also may proceed against Heartland with respect to the entirety of his TGC investment on the aiding and abetting claims.

## CONCLUSION

For the foregoing reasons, the Court grants PNC's motion to dismiss [114]. The Court dismisses Plaintiffs' claims against PNC with prejudice. The Court grants in part and denies in part Heartland's motion to dismiss [117]. The Court dismisses Vision 8110, LLC's claim against Heartland for affirmative violations of the FOA and limits Kuehner's claim against Heartland for affirmative violations of the FOA to his $300,000 2018 TGC investment.

Dated: December 15, 2021

SARA L. ELLIS
United States District Judge